UNITED STATES of America,
Plaintiff–Appellee,

v.

Jose ABONCE–BARRERA,
Defendant–Appellant.

No. 99–10282.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 13, 2000

Filed July 20, 2001

Laurie Kloster Gray, Esq., United States Attorney's Office, San Francisco, California, for the plaintiff-appellee.

Daniel G. Herns, Esq., Law Offices of Daniel G. Herns, San Jose, California, for the defendant-appellant.

Before: WALLACE, FISHER, and RAWLINSON, Circuit Judges.

WALLACE, Circuit Judge:

Jose Abonce–Barrera appeals from his convictions for conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846; distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1); and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1). The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

## I

In January 1998, a Drug Enforcement Administration (DEA) informant contacted Martin Tapia, a known drug trafficker, to arrange for the purchase of thirty pounds of methamphetamine. Later, Tapia introduced the informant to Jose Padilla, who was to deliver the methamphetamine. DEA agents requested that the informant arrange for Padilla to provide a sample. The informant, undercover DEA agent Florentino Rosales, and Padilla met at a restaurant in San Jose, California (the first meeting). The DEA agent was wearing a body recording device, and the conversation took place in Spanish. At this meeting, Padilla explained that he did not have the sample with him. He made a call on his cellular telephone and then explained that the person who was supposed to bring the sample could not arrive for several hours. Another meeting was arranged for a later date.

The next meeting took place two days later (the second meeting). Padilla provided the informant with a sample, which he immediately gave to Rosales. Subsequently, the informant was told by DEA agents to finalize the details of the purchase of thirty pounds of methamphetamine. A week later, the informant, again wearing a body recording device, met Padilla at a gas station to complete the transaction (the third meeting). Padilla, however, did not have the methamphetamine. Approximately forty-five minutes later, Abonce–Barrera arrived. Abonce–Barrera gave the informant a sample; however, he stated that he had brought only five pounds of methamphetamine rather than the promised thirty pounds. Abonce–Barrera told the informant that he could deliver another ten pounds, but that he could not deliver the entire thirty pounds because he had other commitments. The meeting was broken off at this news.

Later that day, the informant was told to contact Padilla for the purpose of obtaining the five pounds of methamphetamine. The informant, Padilla, and Abonce–Barrera met again at the gas station (the fourth meeting). The informant, who was still wearing the recording device, and Abonce–Barrera got into the informant's truck. A short time later, the informant alerted the agents that the methamphetamine was present. Agents moved in, and Abonce–Barrera was arrested. The agents found four pounds of methamphetamine and a cellular telephone. The cellular telephone records revealed that Padilla had repeatedly called a pager number registered to Abonce–Barrera during the first meeting. The records also revealed that Padilla called this number repeatedly while waiting for the third party to bring the methamphetamine to the gas station.

During the trial, recordings from the first, third and fourth meetings provided key evidence of Abonce–Barrera's involvement. DEA agent Rosales, who was present at the first meeting, was qualified as an expert to testify at trial as to the transcription of the recordings and their translation into English. Each member of the jury was given a copy of both the verbatim Spanish transcriptions and the English translations of those transcriptions. In addition, the Spanish-language tapes were played for the jury, and the English translations were read to the jury.

## II

■ Abonce–Barrera makes several related arguments with respect to the transcription and translation of the Spanish language tapes. He contends that the district court failed to formulate "a just and practical method for the use of the body wire tapes." He asserts that he was not afforded sufficient time to review the gov-

ernment's transcriptions and translations and that the tapes were of such poor quality and the process of transcription so problematic that the district court should have ordered "the wholesale exclusion of the tapes or a continuance of the trial to attempt to fashion a better approach."

■■■ Where there is no dispute as to accuracy, we review for abuse of discretion the district court's decision to admit the transcriptions and their English translation and to allow the jury to take such exhibits into the jury room. *United States v. Rrapi,* 175 F.3d 742, 746 (9th Cir.1999); *United States v. Fuentes–Montijo,* 68 F.3d 352, 354 (9th Cir.1995). Abonce–Barrera has made no effort on appeal to allege specific inaccuracies in the transcriptions and their translation. Because we are left "with largely conclusory allegations of possible inaccuracy," abuse of discretion is the proper standard. *United States v. Pena–Espinoza,* 47 F.3d 356, 359 (9th Cir.1995). We also review the district court's decision to allow the use of transcripts as an aid in listening to tape recordings for abuse of discretion. *Rrapi,* 175 F.3d at 746. " 'A recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy.' " *Id., quoting United States v. Tisor,* 96 F.3d 370, 376 (9th Cir. 1996).

■■■ In the case of foreign language tapes, we review whether the following steps were taken to ensure the accuracy of the transcriptions and their translation: (1) whether the district court reviewed the transcriptions and translations for accuracy, (2) whether the defense counsel had the opportunity "to highlight alleged inaccuracies and to introduce alternative versions," and (3) whether "the jury was allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations." *Id.* No single question is dispositive. *See United States v. Armijo,* 5 F.3d 1229, 1234–35 (9th Cir.1993) (No abuse even where "the trial judge did not review the tape for accuracy because he was not fluent in Spanish and there was no agent involved in the conversation who could testify to its accuracy").

Six months before his trial, Abonce–Barrera entered into a stipulation with the government in which it was agreed that the government would provide Abonce–Barrera with successive drafts of its transcription and translation efforts on the condition that the draft versions could "not be used by either side as evidence in the case or to impeach the person or persons who helped prepare the transcription and translation or to impeach the accuracy of the final transcripts." The government provided drafts to the defense in July 1998, on December 21, 1998, on January 11, 1999, and on January 15, 1999. The start of trial was continued to January 26, 1999, to afford Abonce–Barrera the opportunity to review the final draft.

The stipulation also set forth procedures for ensuring that the translation at trial would be accurate, including a provision stating that "the defendants and defense counsel will provide to the United States copies of the transcriptions and translations prepared by the defense of those tape-recorded conversations that the defendants and defense counsel intend to use at trial." Thus, Abonce–Barrera was clearly on notice six months before trial that the transcriptions and translations of the tapes were going to play a key role in the prosecution and that he would have the opportunity to present competing transcriptions and translations at trial of the Spanish-language tapes.

The district court held hearings before trial regarding the qualifications of the government's expert and the accuracy of the government's transcripts and translations. At trial, Abonce–Barrera was given

the opportunity, within the confines of the stipulation, to cross-examine the government's witness regarding the translations. The jurors were allowed to listen to the tapes to detect any problems with audibility and to compare the tapes to the transcriptions. Abonce–Barrera presented his own expert to testify about the transcription process employed by the government. Abonce–Barrera's argument that he had insufficient time to review the government's transcriptions and translations is further belied by the fact that Abonce–Barrera's counsel did bring to the government's attention several objections to the translations. All but two of the objections were incorporated by the government, and these two objections were brought to the attention of the jury at trial.

In light of the steps taken by the parties and the district court, we hold that the district court did not abuse its discretion in admitting the transcriptions and translations. The case before us is remarkably like *United States v. Franco*, 136 F.3d 622, 626 (9th Cir.1998), where

> [t]he district court gave the defendants abundant time to review the English-language transcripts and the tapes. It informed the defendants that, to the extent that they did not succeed in securing the government's consent to suggested corrections, they should submit competing translations of disputed passages. Although the defendants did succeed in making numerous agreed corrections, they submitted no competing translations. The district court accordingly was quite correct in concluding that the defendants had not placed the accuracy of the transcripts in issue.

### III

■■■ Abonce–Barrera also contends that DEA agent Rosales should not have been qualified by the district court as an expert in the translation and transcription of the Spanish-language tapes. Federal Rule of Evidence 702 provides that if "specialized knowledge will assist the trier of fact to understand the evidence … a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "The determination whether an expert witness has sufficient qualifications to testify is a matter within the district court's discretion." *United States v. Garcia*, 7 F.3d 885, 889 (9th Cir.1993) (internal quotation omitted). Further, "in considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir.2000).

The district court conducted a pre-trial hearing at which Agent Rosales's qualifications were examined. Agent Rosales's native language is Spanish; he was born in Mexico and lived there until the age of fifteen. He had lived in the United States for twenty years and attended high school and college here. At college, Rosales took between twenty-four and thirty courses in Spanish and Latin American Studies. After being graduated from college, Rosales worked for a Chicago-based, nonprofit organization dedicated to counseling troubled Latino youth. His ability to translate and understand Spanish was an essential part of his job responsibilities. Rosales next worked as a certified social worker for the Illinois Department of Children and Family Services. This job required Rosales to utilize his abilities to translate between Spanish and English frequently. Spanish language proficiency was also a necessity for his job with the DEA: Rosales has been required to interview non-English speaking defendants, translate undercover work for other agents, monitor transmissions from undercover buys, and act as a translator in debriefing defendants. In addition, prior to joining the DEA, Rosales took a language proficiency test with the

FBI and received one of the highest scores.

Abonce–Barrera asserts that these credentials are not sufficient to qualify Rosales as an expert in the transcription and translation of Spanish-language tapes. He points out that Rosales had never before been qualified as an expert. However, there is nothing in Rule 702 that requires an expert to have been previously qualified as an expert; such an approach would lead to absurd results.

 He also contends that Rosales, as an active participant in the investigation of this case, was incapable of providing an unbiased opinion. But Abonce–Barrera did not seek to disqualify Rosales from testifying in the district court because of his alleged bias, so that argument is waived. *See United States v. Cook*, 53 F.3d 1029, 1031 (9th Cir.1995). We may, however, review the trial court's decision for plain error. *United States v. Wilson*, 690 F.2d 1267, 1273–74 (9th Cir.1982). Generally, evidence of bias goes toward the credibility of a witness, not his competency to testify, and credibility is an issue for the jury. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir.1999). Further, Abonce–Barrera had the opportunity to cross-examine Rosales fully about any biases, and Rosales's credibility as an expert was impeached by defendant's expert, who testified that it was inadvisable to have a participant to a conversation transcribe and translate that conversation. Although the government's use of a neutral expert would have obviated this problem,—and would probably have avoided much of the litigation dispute both in the district court and in this appeal—the trial court did not abuse its discretion or commit plain error in qualifying Rosales to testify about the transcription and translation of the Spanish-language tapes.

IV.

Abonce–Barrera's final contention is that his Sixth Amendment right to confront witnesses was violated because the government refused to provide complete information about the undercover informant.

A.

Prior to trial, Abonce–Barrera's co-defendant, Padilla, argued to the district court that he had not received all discoverable material about the informant. This nondispositive motion was referred to a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A). In his memorandum in support of the motion, Padilla requested "disclosure of the informant," including the informant's identity and whereabouts, the informant's criminal record, any government notes and records of interviews with the informant, and "all forms of promises, inducements and/or deals between the government and its informant." Padilla urged that this information was necessary because the informant was "the sole percipient witness," Padilla could reasonably assert an entrapment defense, and Padilla would need impeachment material at trial. The government responded to Padilla's motion by stating "the Government has disclosed the informant's compensation in this case, prior cooperation agreements with the Government but not related to this case, information regarding the informant's immigration status, and a redacted copy of the informant's criminal history report." The government refused to provide the informant's identity out of safety concerns and had provided only redacted materials. The government did, however, concede that the informant was a percipient witness and agreed to make the informant available for a pre-trial interview.

At the motion hearing held on January 15, 1999, Abonce Barrera asked to join in

Padilla's motion, and this request was granted by the magistrate judge. The defense first argued that it was entitled to receive an affidavit prepared by Agent Rosales regarding the informant. The magistrate judge reviewed the affidavit and ordered it to be filed under seal. The defendants next asserted that, although the government had provided them with the informant's payment history, they were entitled to "a list of cases in which the informant has testified as a witness and that would correlate to the disclosure of the payments to the informant" in order to impeach the informant properly. The magistrate judge did not specifically address this argument. The defendants also requested a complete criminal history and an account of any pending litigation. The magistrate judge stated that they were entitled to such material and questioned the government's attorney, who replied that he was aware of only one conviction (for marijuana possession) and that there were no pending criminal charges. To this, defense counsel responded, "If the government's representing that that's the entirety of his criminal history, I have it."

In addition, the defense stated that it required additional supporting immigration documents, although it had received a "series of letters from an Assistant United States Attorney ... to representatives of the Immigration Service intervening in the informant's immigration proceedings." The court responded, "All you have to know is that he was subject to deportation and that he was not deported and that he's here." The defense then asked about its request for a debriefing report on the informant, any notes about the informant, and statements by the informant. The magistrate judge responded that the defense would be entitled to receive at trial any statements, as defined by the Jencks Act, made by the witness but that the government attorney's personal notes constituted privileged work product. Finally, the defense, after having withdrawn its request for the informant's address, argued that the government was required to provide the name of the informant. The magistrate judge ruled that the government had met its burden on the safety issue. In response, the defense asked, and received, leave to renew its motion on the identity issue at a later date. At the conclusion of the hearing, the magistrate judge said to the defense, "You're getting everything you asked for. You will get disclosure of the informant's identity at trial. That is customary.... I deny your motion because the government has voluntarily provided you with everything you're entitled to under the law. So for the record your motion is denied."

On the first day of trial, January 26, 1999, after the name of the informant had been disclosed, the defense renewed its request that "the court order the unredacted copies of what was provided in *Giglio* materials" because the government could no longer have any concern for the informant's safety. The government responded that the defense had agreed it was not entitled to the informant's address and that the defense had not specifically requested any other identifying information in the hearing before the magistrate judge. In addition, the government expressed continued concerns about the informant's safety. The district court judge agreed with the government and stated, "[T]he matter was heard by [the magistrate judge], who made a decision. It strikes me that the government has complied with that decision, and I don't think anything more should be ordered at this point. You have the name. I'm going to leave it as it is."

### B.

On appeal, Abonce–Barrera first argues that the magistrate judge erred in refusing

to order pre-trial disclosure of (1) the informant's identity, (2) a list of the cases on which the informant worked, (3) the affidavit prepared by Agent Rosales regarding the informant, and (4) the report on the debriefing of the informant. Abonce–Barrera asserts that, because of the lack of these materials, he was unable to impeach the informant properly at trial and he was "unduly restricted in his ability to investigate and/or develop an entrapment defense." The government responds that Abonce–Barrera has waived his ability to challenge the magistrate judge's decision on the scope of pre-trial disclosure because he failed to file an appeal of the magistrate judge's order to the district court.

### 1.

■ With respect to nondispositive matters heard by a magistrate judge, the Magistrates Act provides:

[A] judge may designate a magistrate to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate's order is clearly erroneous or contrary to law.

28 U.S.C. § 636(b)(1)(A). The Magistrates Act contains "[n]o specific procedures or timetables for raising objections to the magistrate's rulings on nondispositive matters." Fed.R.Civ.P. 72(a) advisory committee's note. In the civil context, Federal Rule of Civil Procedure 72(a) (Civil Rule 72(a)) was enacted to "avoid uncertainty and provide uniformity." *Id.* This rule

provides, "Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made." No counterpart to Civil Rule 72(a) exists in the Federal Rules of Criminal Procedure.

In *Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174–76 & n. 1 (9th Cir.1996), we held that failure to appeal to the district court a magistrate judge's order on a nondispositive matter in accordance with Civil Rule 72(a) resulted in forfeiture of appellate review of the order. To reach this result, we relied on Civil Rule 72(a) and on *Thomas v. Arn*, 474 U.S. 140, 146, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), in which the Supreme Court approved the Sixth Circuit's use of its supervisory powers to create a rule whereby a party waived appellate review of a magistrate judge's *dispositive* orders under 28 U.S.C. § 636(b)(1)(B) by failing to appeal those orders to the district court. *See Simpson*, 77 F.3d at 1174–76.

■ The government urges us to extend our holding in *Simpson* to the criminal context and require criminal defendants to comply with Civil Rule 72(a) in order to preserve appellate review of a magistrate judge's ruling on a nondispositive motion. We have emphasized, however, that our supervisory authority is limited. *See United States v. Tucker*, 8 F.3d 673, 674 (9th Cir.1993) (en banc) ("[T]he circumstances under which we may exercise [supervisory] power are substantially limited."); *United States v. Gatto*, 763 F.2d 1040, 1045 (9th Cir.1985). Although we have supervisory power to formulate procedural rules, we may act only when there exists "a clear basis in fact and law for doing so." *Gatto*, 763 F.2d at 1046 (internal quotations omitted). Further,

"the federal judiciary's supervisory power is a power it enjoys only concurrently with Congress, and over which Congress has the final say." *Id.; see also Carlisle v. United States,* 517 U.S. 416, 426, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996) (supervisory power "does not include the power to develop rules that circumvent or conflict with" the Constitution, federal statutes, or federal rules of procedure). In the present case, several considerations lead us to hold that the requisite "clear basis in fact and law" for adopting, with our supervisory authority, the government's proposed rule is absent.

First, we must deal with whether we are controlled by *Simpson*'s language. In holding that objections to a magistrate judge's ruling on a nondispositive issue must be filed with the district court to preserve appellate review, *Simpson* heavily relied on the fact that Civil Rule 72(a) was amended in 1991 to prohibit "an aggrieved party who fails to object within the ten-day period from later 'assigning as error a defect in the magistrate judge's order.'" 77 F.3d 1170, 1173–74 (9th Cir. 1996) (internal citation omitted). *Simpson* was a civil case and its holding only extends to the civil context. As already mentioned, the Federal Rules of Criminal Procedure contain no counterpart to Civil Rule 72(a). In addition, although prior to *Simpson* our case law was inconsistent, there was no inconsistency among *criminal* cases, and the *criminal* case closest in time to *Simpson* held that defendants were not required to file objections in the district court to preserve appellate review of a magistrate judge's ruling on a nondispositive matter. *United States v. Bogard,* 846 F.2d 563, 567 n. 2 (9th Cir.1988). Because *Simpson* dealt only with civil discovery, any effort to change *criminal* case law would necessarily be nonbinding dicta. Indeed, *Simpson* entirely failed to explain how a rule of *civil* procedure could accomplish such a task. *See Simpson,* 77 F.3d

at 1174. If a rule like Civil Rule 72(a) should be adopted in criminal discovery, we believe the normal rule-making process should be employed.

Second, the absence of a criminal counterpart to Civil Rule 72(a) is of further significance because of the way the Magistrates Act distinguishes between nondispositive matters under 28 U.S.C. § 636(b)(1)(A) and dispositive matters heard pursuant to 28 U.S.C. § 636(b)(1)(B). With respect to dispositive motions, the Magistrates Act provides, "Within ten days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations *to which objection is made.*" *Id.* § 636(b)(1)(C) (emphasis added). Thus, as to *dispositive* matters in both the civil and criminal context, there is in place a formal procedure, akin to Civil Rule 72(a), to which parties must adhere in order to have their objections heard by the district court. As to nondispositive matters, the Magistrates Act provides only that the district court "may reconsider any pretrial matter ... where it has been shown that the magistrate's order is *clearly erroneous or contrary to law.*" *Id.* § 636(b)(1)(A) (emphasis added). There is no formal procedure specified for review of a nondispositive order by the district court. The Magistrates Act thus treats them differently. Further, the Magistrates Act's specification that nondispositive matters are to be reviewed by the district court under a far more deferential standard-"clearly erroneous" and "contrary to law"-than dispositive matters indicates that decisions by the magistrate judge on nondispositive matters are essentially "final decisions of the district court which may be appealed in due course with

other issues." *United States v. Brown,* 79 F.3d 1499, 1504 (7th Cir.1996) (stating but then rejecting this proposition without further discussion); *see also Arn,* 474 U.S. at 151 n. 10, 106 S.Ct. 466 (indicating that Congress "clearly intended [a magistrate judge's ruling on a nondispositive motion] to be final unless a judge of the court exercises his ultimate authority to reconsider the magistrate's determination." (internal quotations omitted)).

Finally, the Federal Rules of Criminal Procedure do contain a provision specifying how requests for discovery are to proceed before the district court. Federal Rule of Criminal Procedure 12(b)(4) states that "[r]equests for discovery under Rule 16" "must be raised prior to trial." Abonce–Barrera timely made his pre-trial request for the discovery of materials regarding the informant, and at trial he renewed that request as to identifying information. In hearing the motion on this nondispositive discovery matter, the magistrate judge acted as the agent of, and not merely an assistant to, the district judge. As discussed above, the text of the Magistrates Act suggests that the magistrate judge's decision in such nondispositive matters is entitled to great deference by the district court. We will not exercise our supervisory authority to break apart this unity of identity between the district court and the magistrate judge absent clear indication from Congress to the contrary. We recognize that two of our sister circuits, the Seventh and the First, have held that a party in a criminal case is required to challenge a magistrate judge's decision on nondispositive matters before the district court in order to seek appellate review of the magistrate judge's order. *See Brown,* 79 F.3d at 1503–04 (7th Cir.); *United States v. Akinola,* 985 F.2d 1105, 1108–09 (1st Cir.1993). In both cases, however, our sister circuits failed to confront the implications of the text of the Magistrates Act and the absence of a coun-

terpart to Civil Rule 72(a) in the Federal Rules of Criminal Procedure.

We now turn to the merits of the magistrate judge's discovery orders.

### 2.

■ We review alleged *Brady* violations de novo. *United States v. Manning,* 56 F.3d 1188, 1197–98 (9th Cir.1995). We review the pre-trial decision to withhold the identity of the informant for an abuse of discretion. *United States v. Spires,* 3 F.3d 1234, 1238 (9th Cir.1993).

■ We are satisfied that the magistrate judge did not abuse his discretion in withholding the identity of the informant before trial. The magistrate judge balanced the extent to which pre-trial disclosure would be helpful to the defendant and the government's interest in protecting the informant. *See id.* In addition, the magistrate judge assured himself that the government would fulfill its promise to provide the defense with a pre-trial interview with the informant and that the government would disclose the informant's identity at trial.

■ Abonce–Barrera also asserts that the magistrate judge erred in failing to require the production of a list of all the cases on which the informant worked. Abonce–Barrera has failed, however, to show how such a list would be material under *Brady.* *See Kyles v. Whitley,* 514 U.S. 419, 434–38, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *Manning,* 56 F.3d at 1198 ("Evidence is material for *Brady* purposes only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different."). In *United States v. Flores,* 540 F.2d 432 (9th Cir.1976), we held that a request "to disclose the names and numbers of the prior cases in which the informant [ ] had testified on behalf of

the government" was not material based only on "a hunch" that the informant may have tampered with evidence in other cases. *Id.* at 437–38. Similarly, Abonce–Barrera has offered nothing to support his proposed fishing expedition beyond stating that it might have been useful. *See also United States v. Cutler,* 806 F.2d 933, 935 (9th Cir.1986) (holding that additional detailed information about a previous unrelated investigation involving an informant could be withheld after balancing the government's interest in insuring the informant's safety).

 Abonce–Barrera's insistence that he should have been provided with both the affidavit regarding the informant prepared by Agent Rosales and the debriefing report on the informant is also ill-founded. Federal Rule of Criminal Procedure 16(a)(2) provides that, apart from certain exceptions not applicable here, "discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or any other government agent investigating or prosecuting the case" is not authorized. *See Flores,* 540 F.2d at 438 (*"Brady* does not create any pre-trial discovery privileges not contained in the Federal Rules of Criminal Procedure."). Abonce–Barrera has not asserted on appeal that there was any violation of the Jencks Act, 18 U.S.C. § 3500 (governing the discovery or inspection of statements made by government witnesses or prospective government witnesses).

## C.

 Abonce–Barrera also raises two alleged *Brady* errors with respect to the informant which took place at trial. First, he asserts that even if pre-trial withholding of the informant's identity was appropriate, he should have received unredacted materials from the government once the informant's name was disclosed at trial.

However, this renewed request for unredacted materials came on the first day of trial, several days before the informant was actually to testify. The district court did not abuse its discretion in finding that the government still retained legitimate safety concerns over the disclosure of other identifying information. *Spires,* 3 F.3d at 1238. Further, the defense expressly withdrew its request for a present address during the hearing before the magistrate judge.

 The final error Abonce–Barrera alleges is that a "conviction for drunk driving was intentionally or inadvertently withheld from the defense." *See id.* The trial transcript shows, however, that the defense was aware of this conviction and was able to cross-examine the informant about it at trial. *See United States v. Aichele,* 941 F.2d 761, 764 (9th Cir.1991) ("When a defendant has the opportunity to present impeaching evidence to the jury ... there is no prejudice in the preparation of his defense."). In addition, the government stipulated that it did not have a record of the drunk driving conviction. Thus, the informant's credibility was further damaged because the jury was able to infer that the informant had lied to the government about his criminal history. *See United States v. Bernal–Obeso,* 989 F.2d 331, 336 (9th Cir.1993) (holding that a lie by defendant to government regarding his past criminal history was exculpatory material under *Brady*). There is no indication, unlike in *Bernal–Obeso,* that this drunk-driving conviction was the "tip of an iceberg of other evidence that should have been revealed." *Id.* at 333 (internal quotation omitted).

AFFIRMED.