PER CURIAM:
Christina and Christopher Adams (“the Adamses”) filed a lawsuit against Labora *1325 tory Corporation of America (“LabCorp”), alleging that its cytotechnologists were negligent in failing to identify abnormalities in Ms. Adams’s Pap smears and that this negligence caused a delay in her cancer diagnosis. LabCorp moved to exclude the testimony of Dr. Dorothy Rosenthal concerning the alleged breach of the cyto-technologists’ standard of care and moved for summary judgment based on the resulting absence of evidence regarding the standard of care. The district court granted both motions, and the Adamses now appeal. We reverse the district court’s evidentiary ruling, vacate the grant of summary judgment to LabCorp, and remand for further proceedings.
I.
In the 32-month period from January 2006 to September 2008, Ms. Adams received five Pap smear tests. Her doctor took scrapings from her cervix, put them on a slide, and sent that slide to LabCorp for review to determine if there were abnormalities in the cells on the slide. Ms. Adams was not diagnosed with cervical cancer until August 2009, when she went to her doctor complaining of vaginal bleeding. By then, the cancer had metastasized in Ms. Adams’s lymph nodes. The Adams-es brought suit against LabCorp, alleging that, between 2006 and 2008, the LabCorp employees who viewed slides of Ms. Adams’s cells failed to properly identify the abnormal cells on those slides that indicated precancerous conditions or cancer. They contend that those mistakes by LabCorp’s employees delayed the diagnosis and treatment of her condition for several years until after her cancer had developed and metastasized.
LabCorp’s method of reviewing samples is as follows. A cytotechnologist reviews each Pap smear slide by examining it under a microscope. Cytotechnologists are not doctors; they are laboratory professionals trained to examine cells using microscopes and to recognize cells that appear abnormal.[1] If any of the cells on the slide has precancerous abnormalities or other indications of cancer, the cytotech-nologist sends the slide to a pathologist[2] for review. If the cytotechnologist does not see or recognize any abnormal cells, no pathologist reviews the slide.
The Adamses retained Dr. Rosenthal as an expert witness to testify about whether LabCorp’s employees breached the standard of care for cytotechnologists when reviewing Ms. Adams’s slides. Dr. Rosen-thal’s qualifications are extensive. She has been a Professor of Pathology at the Johns Hopkins School of Medicine since 1995 and served as Director of Cytopathology for the Johns Hopkins Medical Institutions from 1995 to 2003. She has two board certifications from the American Board of Pathology: one in Anatomic and Clinical Pathology, and another described as an Added Qualification in Cytopathology.[3] She served on the initial task force that developed the Bethesda System terminology, which is the classification system that *1326 pathologists and cytotechnologists — including those working at LabCorp — use for reporting Pap smear results.[4] She testified in her deposition that she also has “over 40 years of experience of training eytotechs.”
Dr. Rosenthal formed her opinion by traveling to Atlanta and reviewing Ms. Adams’s slides at LabCorp’s laboratory. She spent about 90 minutes examining Ms. Adams’s Pap smear slides, using the same model of microscope that LabCorp’s cyto-technologists used. She did not mix in slides from other patients, and she already knew that Ms. Adams had been diagnosed with cervical cancer. Dr. Rosenthal ultimately concluded that LabCorp’s cytotech-nologists’ review of Ms. Adams’s slides fell short of the applicable standard of care by failing to identify abnormal cells that should have been identified.
After the discovery period had closed, LabCorp moved to exclude Dr. Rosenthal’s testimony concerning the alleged breach of the cytotechnologists’ standard of care. In its motion, LabCorp contended that Dr. Rosenthal’s review of Ms. Adams’s Pap smear slides was tainted by an unreliable methodology. Assuming that Dr. Rosen-thal’s testimony were excluded, LabCorp also moved for summary judgment based on the absence of evidence regarding the cytotechnologists’ standard of care, an essential element of the professional negligence claim.
The district court granted LabCorp’s motion to exclude Dr. Rosenthal’s testimony based on its conclusion that her methodology did not meet the reliability requirement of Federal Rule of Evidence 702.[5] The court characterized her methodology as an ipse dixit assessment that could not be meaningfully reviewed by other experts. It insisted that she should have used a blinded review to evaluate Ms. Adams’s slides,[6] citing the litigation guidelines approved by the College of American Pathologists (“CAP”) and American Society of Cytopathology (“ASC”) as evidence that a blinded review was the standard set by the profession. The district court was troubled by the risk of bias in Dr. Rosen-thal’s assessment, based on the general risk of review bias in non-blinded reviews,[7] as well as Dr. Rosenthal’s deposition state *1327 ments about her “philosophical bent” toward patients later diagnosed with cancer. Finally, the district court observed that Dr. Rosenthal’s methodology did not adequately simulate a cytoteehnologist’s working conditions and circumstances, and that her role as a pathologist is “materially different in function and scope” from that of a cytotechnologist.
After Dr. Rosenthal’s opinion on the standard of care was excluded, the district court granted LabCorp’s motion for summary judgment.
II.
We review for abuse of discretion a district court’s evidentiary ruling under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141-42, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). We defer to the district court unless its ruling was “manifestly erroneous.” Tampa Bay Water v. HDR Eng’g, Inc., 731 F.3d 1171, 1183 (11th Cir.2013) (quoting Joiner, 522 U.S. at 142, 118 S.Ct. 512). The deference we show includes giving the court “considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.” Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Even where a ruling excluding expert testimony is “outcome determinative” and the basis for a grant of summary judgment, our review is not more searching than it would otherwise be. Joiner, 522 U.S. at 142-43, 118 S.Ct. 512.
III.
The Adamses contend that the district court abused its discretion in excluding Dr. Rosenthal’s testimony.
In Daubert, the Supreme Court explained that trial courts must act as “gatekeepers” tasked with screening out “speculative, unreliable expert testimony.” Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir.2010) (citing Daubert, 509 U.S. at 597, 113 S.Ct. 2786). In that role, trial courts may consider a non-exhaustive list of factors including (1) whether the expert’s theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community. Id. Later, in Kumho, the Court explained that the gatekeeping function governs all expert testimony based on “scientific technical, or other specialized knowledge,” not just scientific testimony. 526 U.S. at 147-49, 119 S.Ct. 1167 (quoting Fed.R.Evid. 702). The Court also stressed that the factors identified in Daubert “do not constitute a definitive checklist or test.” Id. at 150, 119 S.Ct. 1167 (internal quotation marks omitted). While those factors may help in assessing the reliability of scientific or experience-based expert testimony, the district court’s “gatekeeping inquiry must be tied to the facts of a particular case.” Id. (internal quotation marks omitted). Furthermore, Kumho emphasized that the goal of gatekeeping is to ensure that an expert “employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Id. at 152, 119 S.Ct. 1167.
Federal Rule of Evidence 702, as amended in response to Daubert and Kumho, provides:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
*1328 (a) the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.
We have distilled from Daubert, Kumho, and Rule 702 these three requirements: First, “the expert must be qualified to testify competently regarding the matter he or she intends to address”; second, the expert’s “methodology ... must be reliable as determined by a Daubert inquiry”; and third, the expert’s “testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue.” Kil-patrick, 613 F.3d at 1335.[8]
The district court excluded Dr. Rosen-thal’s testimony based on its conclusion that her methodology was unreliable.[9] The court gave four grounds for its decision. We address each in turn.
A.
The district court determined that “Dr. Rosenthal’s methodology ... is an ipse dixit assessment that is devoid of any methodology that would allow another expert to challenge it in any objective sense.” Adams v. Lab. Corp. of Am., No. 1:10-CV-3309-WSD, 2012 WL 370262, at *15 (N.D.Ga. Feb. 3, 2012). The court criticized her further for “not engaging] in a peer-reviewable evaluation because her opinion was reached without the implementation of any objective standards or controls.” Id.
The district court’s determination was a “manifestly erroneous” conclusion. Tampa Bay Water, 731 F.3d at 1183. Dr. Rosenthal did not make an ipse dixit assessment. Her opinion “was based on a widely accepted methodology and grounded in the available physical evidence.” United Fire & Cas. Co. v. Whirlpool Corp., *1329 704 F.3d 1338, 1342 (11th Cir.2013). She personally reviewed the available physical evidence, which consisted of Ms. Adams’s Pap smear slides that had been sent to LabCorp for the Pap tests. Dr. Rosenthal did so using the same standard microscope as LabCorp’s cytotechnologists, scanning each slide in the same general manner as its cytotechnologists do.[10] She later photographed Ms. Adams’s slides and used those photographs in her deposition testimony, marking the areas in each picture where she had identified an abnormality.
Dr. Rosenthal used a well-established classification system to assess the cells: the same Bethesda System that Lab-Corp’s cytotechnologists use. In her deposition testimony she went picture-by-picture, pointing to specific places in each one where Ms. Adams’s cells showed abnormalities and classifying those abnormalities using the same Bethesda classification system that is used by LabCorp’s cytotechnologists and nearly every other professional in the field of cytopathology. And the Bethesda Atlas, which is maintained by the ASC, provides numerous examples of each abnormality that Dr. Rosenthal identified, including “classic examples” of abnormal cells as well as “borderline” cells. As Dr. Rosenthal explained in her deposition, the images in the Atlas could be used to assess whether her opinion was in step with the established standards in the field. The fact that Dr. Rosenthal applied an established diagnostic system in which she was well versed contributed to the reliability of her methodology. See, e.g., Pipitone v. Biomatrix, Inc., 288 F.3d 239, 246-47, 251 (5th Cir.2002) (reversing the district court’s exclusion of a medical expert’s testimony after concluding that the expert’s methodology was sufficiently reliable, in part because he formed his opinion “based on generally accepted diagnostic principles” that he applied in his personal examination of the plaintiff).
In addition to the Bethesda System, Dr. Rosenthal used her extensive experience in the fields of cytopathology and cytotech-nology to assess whether LabCorp’s employees’ failure to identify those cells fell below the standard of care. She served on the task force that developed the Bethesda System terminology, the same diagnostic system that LabCorp’s cytotechnologists use and that she used to review their work. Dr. Rosenthal reviews an average of 150 Pap smear slides every six weeks as part of her duties at Johns Hopkins, and she has trained cytotechnologists for more than forty years. That experience, as well as her knowledge of the risk of review bias,[11] made her well aware of the conditions and limitations of the LabCorp cyto-technologists’ review and of her own review of their work.[12] As she explained, the *1330 criterion she applied during her review was “what would I expect a brand new cytotech student the next day after she graduates or he graduates to do with this case if they saw it.” Dr. Rosenthal’s application of her extensive, relevant experience contributed to the reliability of her methodology. See, e.g., Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., 388 F.3d 976, 982 (6th Cir.2004) (holding that the district court abused its discretion in excluding a doctor’s standard-of-care testimony that was “supported by extensive relevant experience”); see also Kilpatrick, 613 F.3d at 1336 (“[TJhere are instances in which a district court may determine the reliability prong under Daubert based primarily upon an expert’s experience and general knowledge in the field.”). It is difficult to imagine how Dr. Rosenthal’s experience could have been more extensive and relevant or contributed more to the reliability of the methodology she used.
[W]hen I'm sitting down and I’m going to review, I don’t always expect — even if I have a lawyer sitting along side [sic] of me — I don't expect every time to find abnormal cells, because I know the frailties of the Pap test, both from a sampling device and from the ability to distinguish between benign and reactive. So that bias, I think it depends upon what your vent [bent?] is when you're sitting down reviewing any case.
Dr. Rosenthal formed her opinion by using reliable tools, applying an established body of medical knowledge, and drawing on her extensive experience in the field.[13] That is not an ipse dixit assessment. The best evidence that it is not comes — indirectly—from LabCorp’s own expert witness, Dr. Seena Aisner. She used the same general non-blinded approach as Dr. Rosenthal. Dr. Aisner received Ms. Adams’s slides from LabCorp and then, without doing a blinded review, evaluated those slides without mixing in slides from any other patients. She then gave her own opinion about each slide, and in her deposition explained why she disagreed with Dr. Rosenthal’s opinion. That squarely contradicts the district court’s as *1331 sertion that Dr. Rosenthal’s methodology did not “allow another expert to challenge it in any objective sense” and was not “a peer-reviewable evaluation.” Adams, 2012 WL 370262, at *15. The methodology not only allowed Dr. Aisner to challenge Dr. Rosenthal’s opinion, she did challenge it.
B.
The district court also concluded that Dr. Rosenthal’s methodology did not “satisfy the generally accepted standards in the area of pathology or cytotechnolo-gy.” Adams, 2012 WL 370262, at *15. Specifically, it faulted her for failing to conduct “a blinded review!,] which is the standard set by the profession in which Dr. Rosenthal practices.” Id. The court decided that a blinded review was the standard set by the profession based on the litigation guidelines created by the CAP and ASC. Id. at *12-15. That was an error of law because Daubert and Kumho do not allow courts to delegate to potential defendants decisions about when and how they may be held civilly liable for their mistakes. And an error of law is necessarily an abuse of discretion. See City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 556 (11th Cir.1998).
As an initial matter, it is important to put these guidelines in context. Both sets of them focus not on how cytotechnologists should go about their duties in examining slides, but instead on how courts should go about their duty to adjudicate claims against cytotechnologists and similar professionals. In the words of the guidelines, they are to be used in assessing Pap smear slides “in conjunction with litigation or potential litigation.”[14] They are not objective, scientific findings; they are not guidelines followed by laboratories to screen for pre-cancerous or cancerous cells; they are policy proposals to limit how the courts can find the members of the organizations liable for professional negligence when they are sued.[15]
As far as we are aware, this is the first time that an industry group has promulgated a set of guidelines that attempts to define and limit the evidence courts should accept when the group’s members are sued.[16] The members of the CAP and ASC have a substantial interest in making it more difficult for plaintiffs to sue based on alleged negligence in their Pap smear screening,[17] and their guidelines do just that.
Both sets of guidelines condemn the practice of allowing plaintiffs to use expert opinions, like Dr. Rosenthal’s, that are formed based on a review of the slides in *1332 which the expert already knows the patient has been diagnosed with cancer. The ASC says that: “Focused review or review with knowledge of subsequent development of carcinoma inevitably biases the objectivity of the review against the laboratory and does not reflect standard practice.” And the CAP says that: “Focussed [sic] review, or review with knowledge of subsequent development of carcinoma, biases the objectivity of the review.” The CAP goes on to declare that: “Unless the review is blinded, it cannot establish deviation from the standard of practice.” That, of course, is a decision to be made by courts, not by self-interested associations.
To address review bias, both sets of guidelines propose that plaintiffs have multiple reviewers conduct a “blind” review in which (a) the plaintiffs slides are mixed in with other normal and abnormal slides, (b) those slides are sent to multiple reviewers who do not know which slides are the plaintiffs, and (c) those reviewers offer their opinion on which slides are normal and which are abnormal. The guidelines insist that there can be no breach of the duty of care “unless there is a consistent finding by the reviewers that the laboratory failed to identify clinically significant abnormalities.” The guidelines seek to skew the evidentiary rules in civil litigation against plaintiffs in at least two ways.[18]
The first way is by imposing a requirement on expert testimony for a plaintiff that, as far as this Court is aware, no court has ever imposed on standard-of-care testimony in professional negligence cases: that an expert witness must eliminate any potential “review bias” in her opinion. Bias in an expert witness’s testimony is usually a credibility issue for the jury. See United States v. Abonce-Barrera, 257 F.3d 959, 965 (9th Cir.2001); DiCarlo v. Keller Ladders, Inc., 211 F.3d 465, 468 (8th Cir.2000). But both sets of guidelines treat the mere risk of review bias as intolerable. They do not specify the frequency or degree to which review bias actually affects reviewers’ judgments. Nor do they cite any empirical evidence supporting their assertion that knowing the outcome “inevitably biases” the reviewer.[19] Yet they insist that a court should exclude expert testimony unless the expert has eliminated entirely the possibility of any review bias. That would be a radical *1333 reworking of Rule 702, which requires courts to determine that the expert’s method is reliable, not that it is free of any possibility of bias.
The second way the guidelines would skew the evidentiary rules against plaintiffs is by imposing a one-sided standard for reliability. Both sets of guidelines require a blinded review to establish a breach of the standard of care, but neither one requires defense experts to base their opinions on a blinded review. (Maybe that is why LabCorp’s expert, Dr. Aisner, did not conduct a blinded review when she evaluated Ms. Adams’s slides.) For example, the CAP’s guidelines say, point blank, that “[o]ne asserting a violation of the standard of care should first have the Pap test slides assessed by qualified reviewers without knowledge of clinical background and in an environment that simulates normal screening practice.” The “one asserting a violation of the standard of care” is, of course, the plaintiff. . The guidelines impose no similar obligation on expert witnesses for the defense. And the ASC’s guidelines condemn non-blinded review because it “biases the objectivity of the review against the laboratory,” but express no concern about non-blinded review biasing the assessment of defense experts against plaintiffs. Clearly, the purpose of the guidelines is to raise the bar only on the plaintiffs’ side of the courtroom.
Despite the skewed nature of the CAP’s and ASC’s guidelines, the district court expressed no skepticism about them, referring to their insistence on blinded review as “the litigation standard within the practice of pathology.” Adams, 2012 WL 370262, at *14 (emphasis added). But neither Daubert nor Kumho permits a scientific or medical community to define a “litigation standard” that applies when its members are sued.
Daubert did acknowledge that, where expert testimony is based on a scientific technique or theory, courts may consider “the particular degree of acceptance” it has in “a relevant scientific community” as an indicator of its reliability. 509 U.S. at 594, 113 S.Ct. 2786 (internal quotation marks omitted). But the “acceptance” to which Daubert refers is the acceptance that the technique or theory has in the community’s own field of practice when the science is being applied outside of the litigation context, not the scientific community’s opinion about the standard or type of proof that should be required in litigation. As the Supreme Court later acknowledged, “there are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory.” Id. at 596-97, 113 S.Ct. 2786. One of those differences is that the scientific community’s search for truth is “subject to perpetual revision” and not driven by the self-interest of parties in litigation. Id. at 597, 113 S.Ct. 2786.[20]
With their guidelines for litigation, the CAP and ASC moved away from disinterested scientific inquiry and into litigation policy to serve their members’ own inter *1334 ests. However much the members of those associations may accept and even applaud the move, it is not scientific acceptance, which is what Daubert involves. Nor is litigation policy “the practice of an expert in the relevant field,” as Kumho thought of it. See Kumho, 526 U.S. at 152, 119 S.Ct. 1167 (stating that the district court’s gatekeeper function is meant to ensure that an expert “employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field”). The district court’s ruling runs afoul of those two decisions, which do not permit delegating to industry groups the gatekeeping duties of the courts.
If the CAP and ASC can define what constitutes admissible expert testimony in their members’ professional negligence cases, then there is no apparent reason why other groups whose members face lawsuits cannot do the same. For example, why couldn’t pharmaceutical companies adopt guidelines setting high standards of proof for establishing that a plaintiffs injury was caused by a given drug and justify doing so based on then-experience with the complex nature of pharmacology and their expertise in the field? Why couldn’t an association of prison guards and wardens presume to define the meaning of “deliberate indifference” or the requirements for admission of evidence in custodial litigation? They can’t because courts do not allow interested groups to set evidentiary or other litigation standards.
C.
The district court also determined that, even apart from the guidelines, Dr. Rosen-thal’s methodology was unreliable because “review bias i[s] inherent’ ” in a non-blinded review, and she admitted in her deposition that she had a “philosophical ‘bent toward a plaintiff who has developed cervical cancer.’ ” Adams, 2012 WL 370262, at *15. In doing that, the district court supplanted the jury’s factfinding role.
We have repeatedly stressed Daubert’s teaching that the gatekeeping function under Rule 702 “is not intended to supplant the adversary system or the role of the jury: ‘vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.’ ” United States v. Alabama Power Co., 730 F.3d 1278, 1282 (11th Cir.2013) (emphasis added) (quoting Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311-12 (11th Cir.1999)). That is the case here.
At most, LabCorp established that there is an unspecified level of risk that Dr. Rosenthal’s assessment might have been biased, and that she had not sought to exclude the possibility of bias by conducting a blinded review. See supra note 19 and accompanying text. The risk of bias would mean, at most, that Dr. Rosenthal’s testimony is to some extent “shaky,” and shakiness goes to the weight of her testimony, not its admissibility. See Ala. Power Co., 730 F.3d at 1282; see also Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir.2011) (“[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.” (internal quotation marks omitted)). All of the bias concerns that the court raised could have been presented to and considered by the jury. LabCorp could cross-examine Dr. Rosenthal to bring out any bias she had and to expose the risk of bias *1335 inherent in the methodology she used. LabCorp’s attorney did question Dr. Ro-senthal on the subject at great length during her deposition, asking her about review bias, the virtue of blinded reviews, and her philosophical bent in favor of plaintiffs with cancer. She could have done the same thing before the jury. Hindsight bias is a common-sense concept — everyone knows that “hindsight is 20/20.” And common-sense concepts are especially appropriate for consideration by a jury. See Stollings v. Ryobi Technologies, Inc., 725 F.3d 753, 766 (7th Cir.2013) (“The judge should permit the jury to weigh the strength of the expert’s conclusions, provided such shortcomings are within the realm of a lay juror’s understanding.”). Whether and, if so, the extent to which an expert’s philosophical bent biases her review is a credibility determination that has always been within the province of the jury. See DiCarlo, 211 F.3d at 468. The same is true of an outcome-knowledge bent. The asserted problems with Dr. Ro-senthal’s testimony could be addressed through the conventional adversarial means and assessed by the jury. Absent some other basis for summary judgment, they should be.
D.
Finally, the district court faulted Dr. Rosenthal’s methodology because her “approach did not account for the similar conditions and surrounding circumstances under which a cytotechnologist works and originally viewed the slides.” Adams, 2012 WL 370262, at *15. The court noted that “[i]t is a fundamental principle under Georgia law that the standard of care in medical malpractice actions requires that expert opinions take into account ‘similar conditions and like surrounding circumstances.’ ” Id. It then reasoned that Dr. Rosenthal’s testimony was unreliable because she had not recreated the conditions and circumstances cytotechnologists face because she did not look at a large number of slides without already knowing whether they contained cells that were abnormal. Id. at *15-16. Even assuming that Georgia law should apply in Rule 702 analysis, the district court’s reasoning was manifestly erroneous.
First, the court overlooked Dr. Rosenthal’s experience in training cyto-technologists and her deposition testimony explaining that when she reviews slides she does consider the conditions under which cytotechnologists conduct their review.[21] Second, Georgia courts have not interpreted their malpractice standard to require that expert witnesses “stand in the shoes of the defendant” as the district court says they must. See, e.g., Hankla v. Jackson, 305 Ga.App. 391, 699 S.E.2d 610, 612-13 (2010) (allowing an expert witness in a medical malpractice case to rely on her review of the plaintiffs medical records in testifying that the nurse midwife breached the standard of care). The district court’s reasoning seemingly would bar all expert medical testimony unless the expert has somehow recreated the same conditions that the defendant was under. For example, if a plaintiff claimed that a defendant doctor prescribed her improper levels of medication, the expert could not just review the plaintiffs medical file to form his opinion. After all, the defendant doctor probably saw numerous patients that day and did so without the benefit of knowing what reaction that a given patient would have to a prescription. Under a standing-in-the-shoes requirement, a plain *1336 tiffs file would have to be mixed in with numerous others and then sent to several doctors who would recommend prescription levels for all of the patients. The plaintiff would have a negligence claim only if those reviewers consistently recommended a different level of medication for the plaintiff. Rule 702 does not impose such a requirement.
Dr. Rosenthal was qualified to testify about cytotechnologists’ standard of care, her methodology was reliable, and her testimony would assist the trier of fact. Kilpatrick, 613 F.3d at 1335. Accordingly, the district court abused its discretion in excluding her testimony.
IV.
For the foregoing reasons, we REVERSE the district court’s ruling excluding Dr. Rosenthal’s opinion on the standard of care for cytotechnologists, VACATE the district court’s grant of summary judgment to LabCorp, and REMAND for further proceedings consistent with this opinion.

. See 1 Exploring Tech Careers 215 (4th ed.2009); see also 42 C.F.R. § 493.1483 ("Standard: Cytotechnologist Qualifications”).

. A pathologist is a doctor who specializes in "the structural and functional manifestations of disease.” Dorland’s Illustrated Medical Dictionary 1416 (31st ed. 2007).

.Cytopathology is "the study of changes in cells in disease.” Dorland’s Illustrated Medical Dictionary 474 (31st ed. 2007).

. See generally World Health Organization, Comprehensive Cervical Cancer Control: A Guide to Essential Practice 39 (2006).

. The district court also granted LabCorp's motions to exclude Dr. Rosenthal’s opinions on causation and inadequate “continuous quality improvement” efforts. However, the district court’s ruling on Dr. Rosenthal’s standard of care testimony is the only evidentiary ruling before us in this appeal. (The Adamses had a second expert witness testify as to causation. Dr. George Kemp testified that the cytotechnologists’ failure to identify abnormal cells on Ms. Adams’s slide delayed the diagnosis of her cancer by several years and thus prevented her from receiving treatment before her precancerous condition became cancerous. So it appears from the record— though we express no opinion on the matter— that Dr. Rosenthal’s causation testimony was not the only causation evidence for the Adamses’ claim based on negligence by Lab-Corp’s cytotechnologists.)

. There are many forms of blinded review. For purposes of this case, the general defining feature of a blinded review that distinguishes it from Dr. Rosenthal's approach is that, in a blinded review, the person reviewing a Pap smear slide does not know (1) the identity of the person to whom any particular slide belongs, or (2) the ultimate outcome for that person (i.e., whether the person has been diagnosed with cervical cancer).

. In her deposition, Dr. Rosenthal defined "review bias” as a form of hindsight bias. She explained that, "[a]ny time you go to look at another case somebody else has looked at and rendered a diagnosis, you’re biased by what they called it, and you’re also biased if you have any additional information.”

. In federal diversity actions, state law (Georgia law in the present case) governs substantive issues and federal law governs procedural issues. McDowell v. Brown, 392 F.3d 1283, 1294 (11th Cir.2004). The district court did not exclude Dr. Rosenthal’s testimony based on substantive Georgia law; it relied on its federal Rule 702 analysis. See infra note 9. So there is no substantive state law issue presented on appeal.

. The district court did not find that Dr. Ro-senthal's testimony failed to meet the first and third requirements of Rule 702 (qualification to testify and helpfulness to the jury). The court noted that LabCorp "does not dispute [Dr. Rosenthal’s] qualifications under Georgia law or Daubert to offer an opinion on the standard of care.” Adams v. Lab. Corp. of Am., No. 1:10-CV-3309-WSD, 2012 WL 370262, at *10 (N.D.Ga. Feb. 3, 2012). However, certain language in the district court’s opinion suggests that the court may have believed that Dr. Rosenthal was not qualified to testify about cytotechnologists' standard of care, given that her role as a cytopathologist is “materially different in function and scope” from that of a cytotechnologist. Id. at *16. To the extent that the district court found that Dr. Rosenthal was not qualified to offer testimony on the standard of care and excluded her testimony on that ground, it was an abuse of discretion to do so. Dr. Rosenthal has stellar qualifications as a cytopathologist, is Board-certified in cytopathology, has trained cytotechnologists for over forty years, and was on the task force that developed the terminology they use. See supra at 1325-26. She could hardly have been more qualified. Cf. McDowell, 392 F.3d at 1296 ("A physician’s area of expertise necessarily encompasses the standard of care applicable to nurses.”).

.The only arguably appreciable differences between Dr. Rosenthal's method and the review method for LabCorp’s cytotechnologists is that Dr. Rosenthal (1) already knew that the patient whose slides she was reviewing had developed cancer and (2) reviewed slides from just one patient. Those differences relate to the lack of blinded review, which we address later. See infra Sections III.C-D.

.See supra note 7 (defining review bias).

.During Dr. Rosenthal's deposition, Lab-Corp's counsel asked her about the possibility that knowing Ms. Adams’s diagnosis had biased her review of the slides. Dr. Rosenthal began her answer by pointing out that she was aware that many false negatives were not the fault of the cytotechnologist and referred to a 1989 study in which she participated that showed that fact. She then said that in conducting her non-blinded review of Ms. Adams’s slides she had considered the position that the cytotechnologists had been in *1330 when examining those slides. She explained that:

. Our concurring colleague questions our approach because we review Dr. Rosenthal's "methodology” when, in his view, her testimony was based "only on the application of professional judgment, not 'methodology.' " He asserts that "there is no methodology” where the expert's opinion involves only "the application of [medical] knowledge.” In using the terminology of methodology we are referring to the manner in which Dr. Rosen-thal reviewed the slides, applied her medical knowledge and experience, including her familiarity with the Bethesda Atlas, and formed her opinion. Whether her approach is called a "methodology” or simply "application of professional judgment” does not matter. Whatever the terminology, the approach is subject to a reliability inquiry. Our case law is clear that even in cases where the reliability determination turns primarily on an expert’s experience, "the district court must still determine the reliability of the opinion, not merely the qualifications of the expert who offers it.” Kilpatrick, 613 F.3d at 1336. So courts should still consider whether the manner (some might say methodology) of applying medical knowledge is itself reliable. See, e.g., In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 762 (3d Cir.1994) (examining whether "evaluation of the patient’s medical records ... is a reliable method of concluding that a patient is ill even in the absence of a physical examination”). If, for instance, Dr. Rosenthal had viewed slides that were different from the ones that LabCorp’s cytotechnologists screened (e.g., slides that had been taken later than the ones at issue), then her method probably would not be reliable under Rule 702. See id. As the concurring opinion points out, the application of Daubert is necessarily flexible and case specific. Whatever the terminology, we have inquired into the reliability of Dr. Rosenthal’s approach and concluded that the district court abused its discretion in finding that approach was not reliable.

. The CAP’s guidelines are titled "Guidelines for the Review of Pap Tests in the Context of Litigation or Potential Litigation,” while the ASC’s guidelines are titled "Guidelines for Review of GYN Cytology Samples in the Context of Litigation or Potential Litigation.”

. The CAP puts the headline "Policy” above its guidelines. And both sets of guidelines state that they are proposals for establishing a method of reviewing Pap test slides "that is fair to both the patient and the laboratory.” An assessment of what is "fair” is obviously a value judgment, not a scientific finding or standard.

. At oral argument, we asked counsel for LabCorp if she was aware of any similar guidelines from any other private organization or industry group. She replied that she was not.

. Both organizations reveal their motivation to reduce litigation when they propose, as one of their guidelines, that "parties should also strongly consider mediation or non-binding arbitration by a panel of individuals trained and having experience in cytopathology before proceeding with civil litigation relating to a Pap test.”

. The district court did note that it was "not hold[ing] that a blinded review conducted pursuant to the College of American Pathologists and American Society of Cytopathology litigation slide review guidelines is the only methodology that would allow an expert to offer an opinion on the standard of care for a cytotechnologist in reviewing Pap smear slides.” Adams, 2012 WL 370262, at *17 n. 11. The court did not, however, specify what form of blinded review short of the kind specified in the CAP and ASC guidelines might suffice. In any event, it is apparent that the CAP and ASC guidelines are the lynchpin for the court’s ruling. They are the sole support offered for the court's conclusion that any form of non-blinded review is unreliable.

. Both sets of guidelines assert that Pap tests performed on patients have an "irreducible false negative rate” of about five percent. But that does not support the claim that non-blinded reviews are hopelessly subjective and biased. The guidelines themselves reveal that the irreducible error rate in initial Pap screening tests is due to "[m]any factors,” and name "sampling problems with specimen collection” as one of them. Any sampling problems in the collection of the cells could not have affected Dr. Rosenthal's methodology or her opinion because she examined all of the slides examined by the cytotechnologists, not a sample of them. The sampling was done before she or the cytotechnologists saw any of the slides. The question is what happened after the cells were collected and placed on the slides.

. We do not mean to suggest that Daubert’s acceptance factor cannot apply to scientific techniques that are primarily applied in law enforcement and the courtroom, such as fingerprint analysis and other forensic disciplines. See, e.g., United States v. Abreu, 406 F.3d 1304, 1307 (11th Cir.2005); see generally Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1317 n. 5 (9th Cir.1995). Instead, we mean that when analyzing the "general acceptance” factor from Daubert, it matters whether an industry group whose expertise lies outside the litigation context is advocating a policy position to benefit its members in litigation.

. See supra note 12 and accompanying text.