[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 19-14294

_____

ANTHONY WILSON,
KIMBERLY WILSON,
the parents of Martez Wilson,
ESTATE OF MARTEZ WILSON,

Plaintiffs-Appellants,

*versus*

EMT SEAN FLACK,
in his individual capacity,
BRIAN PORTERFIELD,
Paramedic; in his individual capacity,

Defendants-Appellees,

CITY OF DOUGLASVILLE, GA.,
OFFICER COYLEE DANLEY,
OFFICER ANDREW SMITH,

                                                        Defendants.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cv-00634-WMR

————————————————

Before JORDAN, BRASHER, and CARNES, Circuit Judges.

JULIE CARNES, Circuit Judge:

Following Martez Wilson's attempted flight from law enforcement officers and Wilson's arrest by those officers, the defendants in this case—Sean Flack (an EMT) and Brian Porterfield (a paramedic)—were summoned to the site of the arrest based on Wilson's complaints that he could not breathe. Defendants having determined that Wilson did not require hospitalization, the officers transported Wilson to jail. Upon arrival, they discovered that Wilson was dead, and ultimately it was determined that his death was caused by a rare condition associated with undiagnosed sickle cell trait.

The plaintiffs in this case include Anthony and Kimberly Wilson, who are Wilson's parents and sole survivors and who allege that, by deliberately disregarding a known and serious medical risk to Wilson, Defendants caused their son's demise. Seeking damages arising from his death, they assert a § 1983 deliberate indifference claim and a state negligence claim against Defendants. Also a plaintiff in this case is Wilson's estate, which asserts the same § 1983 deliberate indifference claim and state negligence claim against Defendants, but which seeks damages for Wilson's pre-death suffering allegedly caused by Defendants' actions.

The district court excluded the testimony of Plaintiffs' medical causation expert pursuant to Federal Evidence Rule 702 and subsequently granted summary judgment to Defendants on all Plaintiffs' claims. Plaintiffs appeal the district court's exclusion of their expert and its summary judgment ruling.

Having carefully reviewed the record and the briefs, and after oral argument, we affirm in part and reverse in part. Specifically, we affirm the district court's exclusion of Plaintiffs' medical expert pursuant to Rule 702 and the court's grant of summary judgment as to the Wilsons' wrongful death claims—that is, the § 1983 and state negligence claims asserting that Defendants caused their son's death. We reverse the district court's grant of summary judgment as to the Estate's § 1983 and state law claims seeking damages for Wilson's pre-death pain and suffering allegedly caused by Defendants' conduct. As to this pain and suffering claim, we remand

the case back to the district court for further proceedings consistent with this opinion.

## BACKGROUND

On March 3, 2015, Douglasville police officers Coylee Danley and Andrew Smith responded to a 911 call reporting a burglary in process at Freewheeling Motor Sports, a recreational vehicle dealership in Douglasville, Georgia. The officers were advised by dispatch that two male suspects had cut the fence at the dealership and were fleeing on foot into a nearby residential neighborhood. When they arrived at the scene, the officers canvassed the area and found an individual later identified as Martez Wilson lying face down in a driveway. Officer Danley approached Wilson in the driveway and directed him to put his hands behind his back, whereupon Wilson complied and was handcuffed. A second male suspect, Carlos Burroughs, subsequently appeared on the scene and was apprehended and handcuffed without incident.

Wilson was limp when the officers found him in the driveway, and he complained that he was having trouble breathing. Officer Smith propped Wilson up against his knee so that he was sitting upright, and he testified that he felt Wilson make a coughing sound as he attempted to breathe. Smith radioed dispatch, reported that Wilson was complaining that he could not breathe, and requested EMS assistance at the scene.

While awaiting EMS, the officers put Wilson and Burroughs in the back of separate patrol cars. Wilson had to be carried to the

patrol car because he was unable to stand. There is evidence that Wilson became increasingly less responsive during his interaction with the officers.

EMS Defendants Sean Flack (an EMT) and Brian Porterfield (a paramedic) arrived on the scene about nine minutes after Wilson was put in the back of the patrol car. Defendants were advised when they arrived that Wilson was apprehended after running from a crime scene and that he had said he was unable to breathe. The officers also allegedly told Defendants that Wilson "no longer wanted to talk to anybody" and they suggested he was faking illness. The officers did not tell Defendants they had found Wilson lying face down in a driveway, that he could not stand and had to be carried to the patrol car, and that he had become less responsive over time.

After speaking to the officers, Defendants approached the patrol car to evaluate Wilson. Wilson was sitting upright in the back of the car when Defendants first saw him, although Plaintiffs suggest that Wilson was already unconscious and being held upright by his seatbelt. Porterfield stated in a written report summarizing his assessment of Wilson that Wilson's eyes were open when he first saw him, but there is other evidence indicating that Wilson's eyes were closed the entire time Defendants were on the scene.

The parties agree that Wilson was not responsive to any questions Defendants asked him, including Porterfield's question about whether Wilson wanted to go to the hospital. The parties

dispute whether Wilson was unable to respond or just unwilling to respond. Porterfield apparently thought it was the latter because he testified that he had difficulty obtaining Wilson's "consent" for further assessment or treatment. Nevertheless, Porterfield admitted in his deposition that he could not determine for certain whether Wilson was conscious and aware of his surroundings during his evaluation.

Despite Wilson's non-responsiveness, Defendants completed at least a cursory assessment of his condition. Porterfield stated that he felt Wilson's face and determined that his skin was "warm and dry" and that he visually assessed Wilson's breathing by watching his chest movements. Porterfield then used a ZOLL monitor to determine Wilson's pulse and oxygen levels. Although Defendants testified that Wilson's pulse was in the 50s or 60s and that his oxygen level was 98 or 99%—both of which would have been considered normal—Officer Smith reported to the EMTs who treated Wilson at the jail later that evening that Wilson's pulse had been 110 and his blood oxygen level 92%. Accordingly, there is a disputed issue of fact concerning Wilson's pulse rate and oxygen level.

Near the end of Wilson's medical assessment, Douglas County Sheriff's Deputy Ryan Cadwell, who had arrived on the scene for backup, noticed that Wilson was foaming at the mouth. Cadwell reported that fact to Defendants, stating "he's foaming at the mouth now, just so you know." Cadwell's comment was captured on a dashcam video recording of the incident.

According to Defendants, because they were satisfied with Wilson's overall appearance, the ZOLL monitor readings, and a lack of observable respiratory issues, they believed his breathing complaints simply stemmed from overexertion after running from the police. They decided Wilson did not need further treatment, but offered to transport Wilson to the hospital if the officers thought that best. One officer commented, "If he doesn't want to talk to you, he doesn't want to go to the hospital." Defendants then terminated the assessment, after spending about seven minutes at the scene and four minutes actively evaluating Wilson. Porterfield admitted that he and Flack left the scene knowing they had not done a full assessment of Wilson, and still unsure about what had caused his breathing complaint.

After Defendants left the scene, the officers radioed dispatch and stated that, although Wilson had been evaluated by EMS, he would not wake up and likely could not be booked into jail in his current state. Nevertheless, the officers transported Wilson and Burroughs to the jail, arriving at the jail about fourteen minutes after Defendants left the scene of Wilson's arrest. When they arrived at the jail, the officers first walked Burroughs inside while Wilson remained in the back seat of Officer Smith's patrol car.

When the officers returned to retrieve Wilson, he was not moving and his body was limp. The officers carried Wilson to a cell. Once they reached the cell, the officers realized that Wilson was no longer breathing and had no pulse. They summoned EMS again and a different paramedic crew arrived, but the responding

paramedic was unable to resuscitate Wilson and he was pronounced dead at that time.

Wilson's cause of death was later determined by autopsy to be what is known as an ECAST (exercise collapse associated with sickle cell trait) event, a rare medical condition that is poorly understood but that is somewhat like exertional heat illness. As described by Plaintiffs, an ECAST is triggered by extreme exertion in an individual with sickle cell trait—which generally is asymptomatic and undiagnosed until after death—causing systemic acidosis and dehydration that ultimately result in blood cell sickling, clotting and clumping of blood cells, and oxygen deprivation leading to death. Supported by their medical expert, Defendants note that there are no established ways to diagnose or treat an ECAST event while it is occurring and that reported cases in the literature usually prove fatal.

Wilson's parents and his estate sued the City of Douglasville, the officers involved in Wilson's arrest, and Defendants Flack and Porterfield to recover for Wilson's death and for his pre-death pain and suffering, asserting a federal claim for damages under § 1983 and a state negligence claim. As relevant to this appeal, Plaintiffs allege that Defendants Flack and Porterfield were deliberately indifferent to Wilson's serious medical needs in violation of his Fourteenth Amendment rights, giving rise to a § 1983 claim, and that they breached various Douglas County policies and the applicable standard of care for treatment with regard to Wilson, as required to recover under Georgia negligence law.

19-14294                Opinion of the Court                    9

Following discovery, Defendants moved to exclude the opinion of Plaintiffs' medical causation expert, Dr. Kris Sperry, and for summary judgment on Plaintiffs' § 1983 deliberate indifference and state negligence claims.  The district court granted both motions, concluding that:  (1) Dr. Sperry was not qualified to testify as an expert and his medical causation opinion was unreliable and (2) Defendants Flack and Porterfield were entitled to summary judgment on Plaintiffs' federal § 1983 and state negligence claims. Plaintiffs appeal both rulings.[1]  As noted above, and for the reasons discussed below, we affirm in part and reverse and remand in part.

## DISCUSSION

I.    Standards of Review

We review the district court's decision to exclude Dr. Sperry's expert testimony for an abuse of discretion.  *See St. Louis Cond. Ass'n, Inc. v. Rockhill Ins. Co.*, 5 F.4th 1235, 1242 (11th Cir. 2021).  "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making [a] determination, or makes findings of fact that are clearly erroneous."  *Original Brooklyn Water Bagel Co. v. Bersin Bagel Grp., LLC*, 817 F.3d 719, 724 (11th Cir. 2016) (citation and quotation marks omitted).

---

[1]  The court also granted summary judgment in part to the City and denied qualified immunity to Officers Danley and Smith, which rulings initially were appealed.  By agreement of the parties, Plaintiffs have now dismissed their claims against the City, Danley, and Smith.  Plaintiffs also dismissed their claims against Deputy Cadwell.

"A district court may also abuse its discretion by applying the law in an unreasonable or incorrect manner." *Id.* (citation and quotation marks omitted). The abuse of discretion standard "requires that we defer to the district court's ruling unless it is manifestly erroneous." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (quotation marks omitted). In addition, we give the district court "considerable leeway" to evaluate the reliability of expert testimony, a task that is "uniquely entrusted" to that court. *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021).

We review the district court's grant of summary judgment based on qualified immunity de novo, applying the same legal standards as the district court. *See Khoury v. Miami-Dade Cty. Sch. Bd.*, 4 F.4th 1118, 1124 (11th Cir. 2021). In conducting our review, we resolve any factual disputes and draw all evidentiary inferences in favor of Plaintiffs and then decide whether Defendants are entitled to qualified immunity under Plaintiffs' version of the facts. *See id.* at 1124–25. *See also Tolan v. Cotton*, 572 U.S. 650, 656 (2014). We acknowledge that the "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." *McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009) (quotation marks omitted). Nevertheless, we view the facts from Plaintiffs' perspective because the determinative issue on appeal in a qualified immunity case is "not which facts the parties might be able to prove" but whether "certain given facts" demonstrate a violation of clearly established law. *Crenshaw v. Lister*, 556 F.3d 1283, 1289 (11th Cir. 2009).

## II.    Exclusion of Dr. Sperry's Expert Testimony

As noted, Martez Wilson died of complications arising from an ECAST event, which is a rare and poorly understood medical phenomenon triggered by overexertion in an individual with sickle cell trait. Unlike sickle cell disease, sickle cell trait does not typically cause any observable symptoms, and thus it usually is never diagnosed during the individual's life. But an individual with sickle cell trait can unexpectedly experience an ECAST in conditions of extreme exertion under stress, and that is what happened to Martez Wilson when he ran from the police.

To prove their § 1983 or their state wrongful death claim, Plaintiffs were obliged to show that Defendants had acted with deliberate indifference to the symptoms presented by Wilson. But even if deliberate indifference was shown, Plaintiffs were also required to prove that Defendant's deficient performance caused Wilson's death. *See Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) ("[A]s with any tort claim, [a plaintiff] must show [her] injury was caused by the defendant's wrongful conduct" to prevail on a deliberate indifference claim); *Zwiren v. Thompson*, 276 Ga. 498, 500 (2003) ("It is clear that a plaintiff cannot recover for medical malpractice, even where there is evidence of negligence, unless the plaintiff establishes by a preponderance of the evidence that the negligence either proximately caused or contributed to cause plaintiff harm." (citation and quotation marks omitted and alteration adopted)).

It was for this purpose that Plaintiffs proffered Dr. Sperry's testimony. The doctor's testimony was intended to establish that if Defendants had provided oxygen and fluids to Wilson and transported him quickly to the hospital, he more likely than not would have survived the ECAST event. In contrast, and supported by their expert, Defendants note that an ECAST event has unclear diagnostic criteria, with no known treatment, and that it is usually fatal regardless of medical intervention. As such, Defendants contend that their treatment failures—assuming there were failures—did not contribute to Wilson's death.

Defendants argued and the district court concluded that Dr. Sperry's purported expert testimony was not admissible. Federal Rule of Evidence 702 governs the admissibility of expert testimony in federal cases. *See United States v. Gillis*, 938 F.3d 1181, 1193 (11th Cir. 2019). Under Rule 702, expert testimony is only admissible if: (1) "the expert is qualified to give competent testimony about the matters he intends to address," (2) the methodology the expert used to reach his conclusions and the opinion derived from it are reliable, and (3) "the [expert's] testimony will assist the trier of fact . . . to understand the evidence or determine a fact in issue." *Id.* at 1193–94. The proponent of expert testimony has the burden to establish its admissibility by a preponderance of the evidence. *See Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 851 (11th Cir. 2021).

The district court held that Plaintiffs met neither the first or second prong of the above test. That is, the court held that

Plaintiffs had failed to show (1) that Dr. Sperry was qualified to opine as to the survivability or proper treatment of Wilson's ECAST event or (2) that the doctor's opinion that Wilson likely would have survived the ECAST event if Defendants had provided him with oxygen, fluids, and rapid transport to the hospital was reliable.  For the reasons discussed below, we find no abuse of discretion in either ruling.

### A.    Dr. Sperry's Qualifications

Dr. Sperry is a forensic pathologist, with expertise in determining the cause of death or the cause of injuries in living or deceased individuals.  Dr. Sperry acknowledged in his deposition that he has no special expertise in sickle cell disease—or even in hematology, generally—and that he does not treat patients or recommend therapeutic procedures for conditions associated with sickle cell disease or sickle cell trait.[2]  Indeed, Dr. Sperry does not treat patients in a clinical setting at all, and he could not recall in his deposition ever treating an individual experiencing an ECAST, although he has identified it as a cause of death post-mortem.  Nor has Dr. Sperry written or published any articles dealing with sickle cell disease, sickle cell trait, or associated conditions like the ECAST Wilson experienced. Based on Dr. Sperry's admissions about his lack of expertise or experience in the relevant field, the district

---

[2]  Sperry recalled treating a few sickle cell disease patients in an emergency room setting when he was an intern in the 1970s, but he could not remember any details about those cases.

court concluded he was unqualified to testify as to the proper treatment or survivability of Wilson's ECAST.

The district court's ruling as to Dr. Sperry is consistent with this Court's case law applying Rule 702, which has recognized the need for an expert to have expertise specific to the topic at issue to satisfy Rule 702. *See United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) (affirming the district court's refusal to qualify an expert to testify as to the chemical structure of a controlled substance where the expert's "academic work and professional experience related more to plant pathology and botany than to chemistry"). If the relevant topic here was the cause of Wilson's death, Dr. Sperry would be well qualified to offer an opinion: as a forensic pathologist, determining the cause of death is his specialty. But the cause of Wilson's death, which everyone agrees was a rare and unexpected ECAST, is not in dispute. What is in dispute—at least regarding Plaintiffs' wrongful death claim—is whether Wilson likely would have survived the ECAST if Defendants had provided the treatments suggested by Plaintiffs: oxygen, IV fluids, and rapid transport to the hospital. Given Dr. Sperry's testimony that he has no expertise in hematology or sickle cell disease and no education in or experience treating any condition associated with sickle cell disease or sickle cell trait—and indeed, that he has very little experience treating patients in a clinical setting at all—the district court reasonably concluded that Dr. Sperry is not qualified to render an expert opinion as to the survivability of Wilson's ECAST or the

potential efficacy of any treatments Defendants might have administered to Wilson on the night of his arrest.

Plaintiffs argue that the district court's ruling that Dr. Sperry was unqualified to offer an expert opinion in this case was incorrectly based on a "broad rule that a doctor of one specialty cannot testify about something that encroaches on another's specialty." That is a mischaracterization of the court's reasoning for excluding Dr. Sperry's opinion, which was primarily based on Dr. Sperry's own admission that he lacked any meaningful training, experience, knowledge, or skill regarding the appropriate treatment for an ECAST in the field or in a clinical setting, not to mention the effectiveness of any such treatment. Indeed, Defendants have presented unrebutted evidence that these issues are poorly understood even among medical doctors who do have clinical experience treating sickle cell disease and ECAST events, much less someone like Dr. Sperry, who acknowledges a lack of such experience.

Plaintiffs also emphasize that Dr. Sperry has vast experience studying cases involving unknown deaths, in the course of which he has performed over 6,000 autopsies, including five or six autopsies of individuals who died of complications involving sickle cell trait. According to Plaintiffs, because Dr. Sperry's experience qualifies him to understand the physiological mechanism by which an ECAST causes a person to die—which Dr. Sperry describes as a sickling of red blood cells, thickening of blood, and ultimately the deprivation of oxygen—he should be allowed to extrapolate the medical interventions that might have prevented death. The

district court did not abuse its discretion by concluding that such an extrapolation would clearly veer into the territory of speculation, given Dr. Sperry's admitted lack of expertise or clinical experience in hematology, generally, or with sickle cell disease, sickle cell trait, and ECAST, specifically.

### B.    Reliability

As noted, the district court also held that Dr. Sperry's testimony as to the survivability of Wilson's ECAST event should be excluded because Dr. Sperry failed to set forth a reliable basis to support his opinion on that issue.  In so holding, the court again relied on Dr. Sperry's admissions in his deposition testimony, specifically:  (1) Dr. Sperry's acknowledgement that there are no evidence-based guidelines or treatment protocols for managing an ECAST event as it is occurring and (2) Dr. Sperry's admission that no peer-reviewed studies support his hypothesis that oxygen and fluids—which Plaintiffs argue Defendants should have provided to Wilson on the scene—would have improved Wilson's chances of surviving the ECAST he experienced on the night of his arrest.  Indeed, Dr. Sperry repeatedly referred in his deposition to the lack of certainty in the field regarding the mechanism that triggers an ECAST, the pathophysiology of such events, and the "best practices" or "established . . . approaches to [their] diagnosis and prevention."  Pointedly undermining his opinion as to Wilson's survivability under the circumstances here, Dr. Sperry conceded in his deposition that he is not aware of any studies as to whether an ECAST is reversible once it has been triggered, nor any peer-

reviewed studies regarding the effectiveness of any treatments once an ECAST has begun.

Based on our review of Dr. Sperry's deposition testimony and the supporting documentation cited in his proffered opinion, the district court did not "manifestly err" when it determined that the doctor's opinion was unreliable. *See Moore*, 995 F.3d at 850 ("We will find an abuse of discretion only if the district court's [Rule 702 ruling] ruling was manifestly erroneous."). Plaintiffs argue that the district court erred by failing to apply the reliability factors identified by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), including: (1) whether the expert's methodology has been or is capable of being tested, (2) whether the expert's theory or technique has been subjected to peer review and publication, (3) the known or potential error rate of the expert's methodology, and (4) whether the expert's technique has been generally accepted in the proper scientific community. *See Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) (discussing the *Daubert* reliability factors). As the Supreme Court has clarified in its post-*Daubert* case law, "a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability" but "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (emphasis in original). "Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in

respect to its ultimate reliability determination." *Id.* (emphasis in original). Thus, the district court's failure to expressly tick off each *Daubert* factor does not undermine its reliability analysis.

Plaintiffs also fault the district court for failing to delve deeply enough into the articles on ECAST treatment and survivability cited by Dr. Sperry in support of his opinion. Having carefully reviewed the cited articles ourselves, we are not persuaded that the district court should be reversed on this issue. Some of the articles are simply not relevant to the stated subject of Dr. Sperry's opinion—that is, the survivability of Wilson's ECAST event. For example, the 2016 Kanzaria article that is attached to Dr. Sperry's declaration is just a longitudinal study showing a general decline in mortality rates over the past several years among adults treated in emergency hospital settings. The article attributes the decline to many factors, including the increased use of hospice care and changes in resuscitation policies. It says nothing at all about treatment for or the survivability of the ECAST condition that caused Wilson's death.

Several of the other articles cited by Dr. Sperry deal primarily with preventive measures—such as screening, hydration, progressive heat acclimatization, and graduated conditioning—to avoid ECAST events in the settings where they are most likely to occur, including sports and army training. These articles are more germane to the topic at hand, but they do not support Dr. Sperry's opinion that Wilson likely would have survived the ECAST he suffered on the night of his arrest if he had been given the

recommended interventions. The fact that certain measures might prevent an ECAST from happening in the first place does not mean those measures can stop or reverse an ECAST that is already in progress. Again, Dr. Sperry himself cited one article in his deposition observing that "[n]o evidence-based guidelines for managing an ECAST event are currently available."

Finally, certain articles cited by Dr. Sperry recommend oxygen and fluids as the best practice for responding to an ECAST, but Dr. Sperry acknowledged in his deposition that the effectiveness of these treatments could not be quantified. For example, in formulating his opinion, Dr. Sperry relied heavily on an article reporting reduced mortality in a population of military recruits when hydration and supplemental oxygen protocols were implemented to reduce exertional heat illness, but Dr. Sperry admitted that the article did not conclude that such treatment would, to any degree of medical certainty, prevent death from an ECAST.[3] That oxygen and

---

[3] The same is true of the 2007 Eichner article cited by Dr. Sperry. Eichner, a medical professor and college football team internist recommends oxygen, fluids, and rapid transport to the hospital when an ECAST is suspected. Eichner reports anecdotally that an athlete with mild sickling "feels fine" after sitting in a cold tub for ten to fifteen minutes, drinking fluids, and getting supplemental oxygen by face mask, and he suggests very generally that supplemental oxygen, cooling, and rapid transport to the hospital can "save a life." But there is no indication that Wilson's sickling was mild when Defendants encountered him—indeed, Plaintiffs' own evidence suggests the opposite—and the Eichner article does not provide any other data that would support Dr. Sperry's opinion that Wilson likely would have survived the ECAST he experienced under the circumstances here.

fluids are the recommended course of treatment does not establish that they likely would have resulted in Wilson's survival, and Dr. Sperry acknowledged that he could offer no opinion as to the specific recommended use of oxygen and fluids—for example, what type of fluids to provide, the rate, quantity, and duration of fluids and oxygen to administer, and at what point in the ECAST process. Dr. Sperry conceded further that there is no literature or study to support the proposition that an ECAST generally is survivable once triggered, or that Wilson's death specifically could have been prevented if Defendants had provided oxygen, fluids, and rapid transport to the hospital.

Plaintiffs argue that medical experts are not required to base their opinions on controlled studies, citing *Adams v. Laboratory Corporation of America*, 760 F.3d 1322, 1328–31 (11th Cir. 2014). Plaintiffs infer from *Adams* that the lack of peer-reviewed studies is not a legal basis to exclude Dr. Sperry's opinion, but *Adams* is distinguishable. The issue in *Adams* was whether the defendant laboratory's cytotechnologists who reviewed the plaintiff's pathology slides had negligently failed to identify cancerous cells in the slides. *See id.* at 1325. To establish negligence, the plaintiff offered the opinion of the Director of Cytopathology from the Johns Hopkins School of Medicine, an expert who had helped develop the classification system for identifying pre-cancerous and cancerous cells on the types of pathology slides involved in the case and who had over 40 years of experience training cytotechnologists. *See id.* at 1325–26.

Despite the expert's extensive experience in the relevant field, the district court in *Adams* excluded her negligence opinion as to the cytotechnologists who had reviewed the plaintiff's pathology slides, concluding that the opinion was unreliable because the expert did not use a blinded review to evaluate the slides—that is, she reviewed the plaintiff's slides with the knowledge that the plaintiff had been diagnosed with cancer and without randomizing and mixing in slides from other patients. *See id.* at 1326, 1330. This Court reversed, noting that the expert had used her "extensive experience in the fields of cytopathology and cytotechnology to assess whether [the cytotechnologists'] failure to identify [the plaintiff's cancer] cells fell below the standard of care." *See id.* at 1229. To the extent the expert's failure to conduct a blinded review rendered her opinion "shaky," the Court explained, such "shakiness goes to the weight of her testimony, not its admissibility." *See id.* at 1334. Accordingly, and given the expert's vast experience with the exact procedures and technology at issue in the case, this Court held that the district court "manifestly err[ed]" when it excluded her opinion as unreliable. *Id.* at 1328 (quotation marks omitted).

As is evident from the above discussion, this case is entirely different from *Adams*. Unlike the expert in *Adams*, Dr. Sperry has no special education or training—and no practical experience whatsoever—in the relevant field of treating or assessing the efficacy of treatments for any hematological condition, including the ECAST Wilson experienced on the night of his arrest. Because Dr. Sperry cannot speak personally to those issues, his opinion is based

solely on the articles he cites concerning ECAST preventive techniques and best practices for responding to an ECAST.  Thus, under the circumstances here, "it was entirely proper—indeed necessary—for the district court to focus on the reliability of th[o]se sources." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1336–41 (11th Cir. 2010) (upholding the district court's exclusion of expert testimony where the expert did not conduct any tests or studies himself, and where the literature upon which the expert based his conclusions "was insufficient to create a reliable methodology").

Finally, Plaintiffs argue that any issues regarding the adequacy of the studies underlying Dr. Sperry's opinion speak to the weight and not the admissibility of his opinion.  We are mindful that "courts must remain chary not to improperly use [Rule 702's] admissibility criteria to supplant a plaintiff's right to a jury trial." *Moore*, 995 F.3d at 850 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (quotation marks omitted)).  *See also Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. 2003) ("[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence . . . [or to] supplant the adversary system or the role of the jury." (citation and quotation marks omitted)).  But neither can a court abdicate its "gatekeeping role" to ensure that expert testimony is reliable before it is admitted, as required by *Daubert* and Rule 702. *See McLain v. Metabolife, Int'l, Inc.*, 401 F.3d 1233, 1238

(11th Cir. 2005) ("A trial court . . . abuses its discretion by failing to act as a gatekeeper" to ensure reliability of expert testimony). To discharge its gatekeeping duties in this case, the district court had to determine whether Dr. Sperry's opinion about the treatability and/or survivability of Wilson's ECAST event was "shaky but admissible" or simply too unreliable to admit. *See Adams*, 760 F.3d at 1334. Based on our review of Sperry's proffered opinion, the supporting materials cited by Dr. Sperry, and his deposition testimony, we cannot say the district court abused its discretion by concluding the latter. Accordingly, we affirm the district court's order excluding Dr. Sperry's medical causation opinion.

## III.    Plaintiffs' § 1983 Claims

### A.    Qualified Immunity

Plaintiffs' claims against Defendants in their individual capacity are governed by the qualified immunity analysis. "Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003). To be clearly established, a right must be sufficiently well-established "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In other words, "existing precedent must have placed the statutory or

constitutional question beyond debate" and thus given the official "fair warning" that his conduct violated the law. *Id.*

Fair warning is most commonly provided by materially similar precedent from the Supreme Court, this Court, or the highest state court in which the case arose. *Terrell v. Smith,* 668 F.3d 1244, 1255 (11th Cir. 2012). However, a judicial precedent with identical facts is not essential for the law to be clearly established. *Youmans v. Gagnon,* 626 F.3d 557, 563 (11th Cir. 2010). Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue. *Griffin Indus., Inc. v. Irvin,* 496 F.3d 1189, 1209 (11th Cir. 2007). And very occasionally, it may be obvious from "explicit statutory or constitutional statements" that conduct is unconstitutional. *Id.* at 1208–09.

A defendant who asserts qualified immunity has the initial burden of showing he was acting within the scope of his discretionary authority when he took the allegedly unconstitutional action. *See Bennett v. Hendrix,* 423 F.3d 1247, 1250 (11th Cir. 2005). Assuming that burden is met, it is up to the plaintiff to show the violation of a clearly established constitutional right. *Id.* Plaintiffs do not dispute that Defendants were acting in the scope of their discretionary authority when they treated Wilson at the scene. Thus, to prevail on their § 1983 claims asserted against Defendants Flack and Porterfield in their individual capacities, Plaintiffs must show that Defendants' treatment of Wilson on the night of his arrest violated a right that was clearly established at the time.

### B.    Deliberate Indifference

Plaintiffs allege that Defendants acted with deliberate indifference to Wilson's serious medical needs on the night of his arrest, in violation of his Fourteenth Amendment rights.[4]  To establish deliberate indifference rising to the level of a constitutional violation, Plaintiffs first must show that Wilson had an "objectively serious medical need" meaning a medical need "that has been diagnosed by a physician as mandating treatment or . . . that is so obvious even a lay person would easily recognize the necessity for a doctor's attention."  *See Hoffer v. Secretary, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) (quotation marks omitted).  Then, Plaintiffs must prove that Defendants "acted with subjective deliberate indifference" to Wilson's need and that Wilson suffered an injury "caused by" that indifference. *See Patel v. Lanier Cnty., Ga.*, 969 F.3d 1173, 1188 (11th Cir. 2020) (quotation marks omitted). The second prong of the analysis requires Plaintiffs to establish three elements:  (1) that Defendants were subjectively aware of the risk of serious harm to Wilson, (2) that they disregarded the risk, and (3) that they acted at least recklessly.  *Id.  See also Hoffer*, 973 F.3d at 1270, n.2 (noting the tension in this Court's caselaw

---

[4] Wilson was an arrestee when Defendants treated him, so his deliberate indifference claim arises under the Fourteenth Amendment as opposed to the Eighth Amendment, which would apply to the same claim asserted by a prisoner. *See Patel v. Lanier Cnty., Ga.*, 969 F.3d 1173, 1188 (11th Cir. 2020).  But the standard is the same whether the claim arises under the Fourteenth or the Eighth Amendment. *See id.*

regarding whether the standard is more than "mere" negligence or "gross" negligence but concluding that the disagreement is a "distinction without a difference" because the Supreme Court requires subjective recklessness).

Although it is undisputed that Wilson had an objectively serious medical need on the night of his arrest, Defendants argue they are entitled to summary judgment on the asserted § 1983 claims because Plaintiffs cannot show that Defendants were deliberately indifferent to Wilson's condition. Defendants also argue that, without Dr. Sperry's opinion, Plaintiffs cannot establish a causal link between Defendants' alleged treatment failures and any injury suffered by Wilson, including his death. As discussed more fully below, Plaintiffs have presented enough evidence to raise a genuine issue of fact as to the essential elements of deliberate indifference in this case and, construing the evidence in the light most favorable to Plaintiffs, the clearly established prong of the qualified immunity analysis has been satisfied. Nevertheless, we affirm the district court's order granting summary judgment on Plaintiffs' § 1983 wrongful death claim because there is no evidence in the record to suggest that Wilson's death was caused by Defendants' alleged deliberate indifference. On the other hand, we reverse the district court's order granting summary judgment on Plaintiffs' claim on behalf of Wilson's estate to recover for his pre-death pain and suffering because Defendants have not shown that "there is no genuine dispute [of] material fact and [that they are] entitled to judgment as a matter of law" as to that claim. *See OJ Commerce,*

19-14294              Opinion of the Court              27

*LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1240 (11th Cir. 2022) (quotation marks omitted).

### 1.    Subjective Knowledge of Wilson's Serious Medical Need

As indicated above, no liability arises for deliberate indifference based on a defendant's failure to alleviate a serious risk he should have perceived but did not. *See Goebert*, 510 F.3d at 1327 (noting the need for "subjective knowledge of the risk of serious harm"). Rather, a defendant must in fact be subjectively aware of the risk to the plaintiff. *See id.* Defendants deny they were subjectively aware of the serious risk to Wilson when they encountered him on the night of his arrest, and they emphasize that there was no way they could have known Wilson was experiencing the rare ECAST that caused his death. According to Defendants, they attributed Wilson's symptoms—including his trouble breathing and elevated pulse—to his recent flight from police. The district court agreed that Plaintiffs had failed to satisfy the subjective knowledge requirement. According to the court, Defendants did not fully appreciate the risk to Wilson because the officers on the scene suggested that Wilson was faking illness and they did not advise Defendants about Wilson's earlier collapse and his deteriorating condition.

We conclude, however, that there is enough evidence in the record to raise a question of fact as to whether Defendants were subjectively aware of a risk of serious harm to Wilson, despite the incomplete information provided by the officers on the scene and

albeit Defendants were not aware of the precise nature of the risk—
that is, death from a rare and poorly understood ECAST. Although
Defendants had incomplete information about Wilson's exact di-
agnosis and his condition before they arrived, a reasonable jury
could find that the symptoms Wilson presented made it obvious
that his condition was dire. *See id.* (explaining that subjective
knowledge of a serious risk sufficient to support a deliberate indif-
ference claim "is a question of fact subject to demonstration in the
usual ways, including inference from circumstantial evidence, and
a factfinder may conclude that [a defendant] knew of a substantial
risk from the very fact that the risk was obvious" (quotation marks
omitted)). Construing the evidence in favor of Plaintiffs, Wilson
had a blood oxygen level of 92% and a pulse of 110, a combination
suggestive of a serious respiratory issue necessitating immediate
treatment according to EMS guidelines and Plaintiffs' paramedic
expert.[5]     Porterfield challenged the pulse reading, but he

---

[5] There is conflicting evidence in the record as to Wilson's oxygen level and
pulse. Porterfield reported that Wilson's oxygen level was 98% or 99%. Of-
ficer Smith stated in a GBI interview that Wilson's oxygen level was 96%, but
Smith stated to the paramedic who treated Wilson at the jail that his oxygen
level had been 92%. As to Wilson's pulse, Defendants recalled that it was be-
tween 50 and 60, but Smith testified that it was 110. There is no objective
record of Wilson's oxygen level or pulse because Defendants did not create a
log of the readings they obtained. But ZOLL monitor readings would have
been visible to people nearby like Smith, and a jury would be authorized to
believe his testimony as to both.

acknowledged in his deposition that if Wilson's pulse was over 100, he should have taken additional steps to diagnose and treat him.

In addition to his critical pulse and blood oxygen levels, evidence in the record, when construed in favor of Plaintiffs, indicates that Wilson was non-responsive and perhaps unconscious when Defendants encountered him and during the entirety of his medical evaluation. For example, there is evidence that Wilson's eyes were closed when EMS arrived on the scene, and that they remained closed throughout the EMS assessment. Further, it is undisputed Wilson was non-responsive to any questions during the assessment. Defendants apparently concluded Wilson was unwilling rather than unable to respond, but it is not clear how they arrived at that conclusion. Defendants were advised prior to assessing Wilson that he had complained of difficulty breathing, which Porterfield agreed can cause a loss of oxygen to the brain and inability to respond. And Defendants were told just before they left the scene that Wilson was foaming at the mouth, another indicator that his non-responsiveness was involuntary, such that he needed further evaluation. See Goebert, 510 F.3d at 1328 ("The problem is that [the defendant officer] did not believe [the plaintiff's complaints about her medical condition], and the reason he did not believe her smacks of deliberate indifference.").

### 2.    Reckless Disregard of Wilson's Condition

Likewise, there is evidence that raises a question of fact as to the second and third prongs of Plaintiffs' deliberate indifference claim—that is, that Defendants disregarded the risk to Wilson and

that they acted recklessly in doing so.  Again, there is some tension in this Court's precedent as to the standard of conduct that applies to a deliberate indifference claim. *See Hoffer*, 973 F.3d at 1270, n.2. *Compare Melton v. Abson*, 841 F.3d 1207, 1223 n.2 (11th Cir. 2016) (describing the standard as more than "mere negligence"), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010) (describing the standard as more than "gross negligence").  Certainly, the fact that a defendant was "negligent in diagnosing or treating a medical condition" does not give rise to a constitutional claim for deliberate indifference.  *Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011) (quotation marks omitted).  *See also Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015) ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process").  At the same time, the standard does not require a defendant to act with the "purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  This Court recently indicated that the correct standard is recklessness, and that is the standard we apply here.  *See Hoffer*, 973 F.3d at 1270, n.2 (analyzing *Farmer* and concluding that "no matter how serious the negligence, conduct that can't fairly be characterized as reckless won't meet the [governing] standard").

The district court concluded that, at the worst, Defendants were negligent in their treatment of Wilson, but reasonable minds could draw a different conclusion from this record. Plaintiffs cite

several serious lapses by Defendants in their treatment of Wilson, including their: (1) failure to respond in any way to Wilson's low blood oxygen level, elevated pulse, apparently altered mental state, and his condition of foaming at the mouth, (2) visually assessing Wilson's breathing rather than using a stethoscope despite Wilson's complaint of difficulty breathing and apparent unconsciousness, (3) failure to gather adequate information about Wilson's condition prior to treating him, and (4) leaving the scene without resolving Wilson's complaint that he was having trouble breathing. Plaintiffs' paramedic expert testified that these lapses amounted to a substantial deviation from the standard of care. That testimony could support a finding that Defendants acted recklessly and with disregard to a serious and apparent medical risk to Wilson under the circumstances. *See Patel*, 969 F.3d at 1189 (observing that "even to a layperson, unconsciousness alone should serve as a strong indicator of the need for immediate medical attention").

### 3.    Clearly Established Law

Finally, and assuming Defendants recklessly disregarded a serious medical risk to Wilson that was evident and about which they were subjectively aware, the clearly established prong of the qualified immunity analysis has been satisfied. This prong of the analysis ordinarily requires a plaintiff to point to factually similar case law that would have made it clear to a defendant that his conduct violated the plaintiff's rights. *See Reichle*, 566 U.S. at 664 (emphasizing the role of "existing precedent" to ensure that "every reasonable officer would have understood that what he is doing

violates" the law).  But Plaintiffs' deliberate indifference claim includes as essential elements Defendants' <u>deliberate disregard</u> of a serious medical risk that Defendants <u>subjectively knew</u> to exist. This Court held in *Patel* that a plaintiff who establishes those elements generally will overcome qualified immunity, explaining:

> Although we haven't identified any controlling case with closely analogous facts, we think the novel facts of the situation are obviously governed by a broader, clearly established principle.  The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.

*See Patel*, 969 F.3d at 1190 (quotation marks and citation omitted). Per *Patel* and our discussion above, the clearly established prong of the analysis is satisfied here because, construing the facts and evidence in favor of Plaintiffs, Defendants:  (1) knew Wilson was suffering from a serious and urgent medical crisis, albeit they did not know the exact nature of the crisis, (2) knew Wilson needed additional assessment and medical care, and (3) recklessly failed to provide the assessment and care that were indicated under the circumstances.

### 4.    Causation and Damages

Nevertheless, to recover for an injury allegedly arising from Defendants' deliberate indifference, Plaintiffs must show that the injury was "caused by Defendants' wrongful conduct."  *Id.* at 1188

(quotation marks omitted). *See also Goebert*, 510 F.3d at 1327 ("The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm."). Without Dr. Sperry's testimony there is no evidence that Wilson's death was caused by Defendants. Indeed, Plaintiffs concede that their claim to recover for Wilson's death cannot survive the exclusion of Dr. Sperry's testimony, because that claim requires proof that some conduct by Defendants resulted in Wilson's death. *See Patel*, 969 F.3d at 1188 (noting that the plaintiff's claimed injury must have been "caused by" the defendant's wrongful conduct). Dr. Sperry's testimony is the only evidence Plaintiffs proffer to establish the required causal link between Defendants' deliberate indifference and Wilson's death; and that testimony was properly excluded.

Accordingly, and as Plaintiffs correctly acknowledge in their appellate briefing, there is no evidence that Defendants caused the death of Wilson for which Plaintiffs seeks damages. That being so, we affirm the district court's summary judgment order as to Plaintiffs' § 1983 wrongful death claim.

The situation is somewhat different, however, as to the claim asserted by Wilson's estate for pre-death pain and suffering Wilson allegedly suffered as a result of Defendants' inaction.[6]

---

[6] Georgia law controls whether this claim survives Wilson's death. *See Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1043 (11th Cir. 2011) (observing that the state survivorship laws of the forum in which an action is filed determine whether a § 1983 claim survives the death of the injured

Specifically, in addition to alleging that Defendants had caused Wilson's death, Plaintiffs alleged in their complaint that Defendants' conduct caused Wilson "pain and suffering while he was still alive."

Yet, although Defendants sought summary judgment as to the wrongful death claim, their summary judgment motion never mentioned Plaintiffs' claim for Wilson's pre-death pain and suffering. Indeed, the causation argument on which their motion was based focused entirely on Plaintiffs' wrongful death claim. Thus, Defendants' summary judgment motion, on its face, failed to show that Defendants were "entitled to judgment as a matter of law" on the Estate's claim for the pain and suffering Wilson allegedly experienced as a result of Defendants' deliberate indifference. *See OJ Commerce*, 34 F.4th at 1240; *see also Edmondson v. Velvet Lifestyle, LLC*, 43 F.4th 1153, 1160 (11th Cir. 2022) ("If the moving party fails to show that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, then summary judgment should be denied—even if the non-moving party has introduced no evidence whatsoever." (quotation marks omitted)).

Indeed, in their summary judgment response brief, Plaintiffs pointed out that even if the district court decided to grant summary

party). Under Georgia law, Wilson's claim for pre-death pain and suffering survives his death and can be recovered by his estate. *See* O.C.G.A. § 9-2-41 ("No action . . . or cause of action for the recovery of damages for . . . injury to the person . . . [shall] abate by the death of either party.").

judgment as to the death claim—based on Plaintiffs' failure to show that Defendants caused Wilson's death—that decision did not eliminate Plaintiffs' claim for pre-death pain and suffering, which was an entirely separate claim. In their summary judgment reply brief, Defendants responded that Wilson could not have suffered any pain because Wilson was unconscious during his interaction with Defendants and therefore would have been unable to experience pain. In support, Defendants noted that in the opening sentence of Plaintiffs' response to the summary judgment motion, Plaintiffs stated that Defendants had "left [Wilson] unconscious in the back of [the police officers'] patrol car.

Unfortunately, the district court's order granting summary judgment never sorted this matter out, but instead granted summary judgment to Defendants based on the court's conclusion that Defendants' conduct did not rise to the level of deliberate indifference. Moreover, there clearly appears to be a "genuine dispute [of] material fact" as to one important part of the pain-and-suffering question: specifically, whether Wilson was conscious during any part of Defendants' interaction with him or thereafter. That is, presumably a person cannot, in a typical situation, suffer or experience pain if that person is unconscious. And given "Plaintiffs' insinuation Wilson was unconscious during Defendants' assessment," Defendants implicitly argue that there is no evidence supporting an inference that Wilson was conscious—and thus would have been able to suffer pain—during the time Defendants' might have provided him treatment. The problem with Defendants' argument is

that Defendants themselves obviously believed Wilson was conscious—and perhaps faking his symptoms—else they otherwise would have transported him to the hospital. Thus, the question of Wilson's consciousness cannot be decided as a matter of law. As Defendants note, it is true that even if one could conclude that Wilson was conscious during the operative time, Plaintiffs would nonetheless be unable to justify a claim for compensatory damages based on pain and suffering without also proving that Defendants' action, or inaction, caused that suffering. But this matter not being adequately litigated at the district court level, we are disinclined to make the first call on the question. Instead, the district court will be empowered to determine that question upon a timely motion for a judgment as a matter of law by Defendants at the close of Plaintiffs' case, pursuant to Federal Rule of Civil Procedure 50. Accordingly, we reverse the district court's order granting summary judgment as to Plaintiffs § 1983 claim asserted on behalf of Wilson's estate for pre-death pain and suffering allegedly caused by Defendants' inaction.

## IV.    State Claims

In addition to their § 1983 claims, Plaintiffs assert a state claim against Defendants for "breach of ministerial duty." That claim is essentially a state negligence claim based on Defendants' breach of the applicable standard of care in treating Wilson. Plaintiffs describe it as a claim for breach of ministerial duty because Georgia law provides immunity to officials exercising their discretionary, as opposed to their ministerial, duties. *See* Ga. Const. art.

I, § 2, ¶ IX(d) (providing state officers and employees with official immunity from suit and liability "for the performance or nonperformance of their official functions"). Specifically, under an exception to official immunity as applied in Georgia law, state officials "may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions." *Id.*

Putting the immunity issue aside for a moment, damages and causation are essential elements of a negligence claim under Georgia law. *See City of Richmond Hill v. Maia*, 301 Ga. 257, 258 (Ga. 2017) ("It is well established that to recover for injuries caused by another's negligence, a plaintiff must show four elements: a duty, a breach of that duty, causation, and damages." (quotation marks omitted)). To that end, a plaintiff seeking to recover on a negligence theory under Georgia law "must prove that the defendant's negligence was both the cause in fact and the proximate cause" of his claimed injury. *Id.* (quotation marks omitted). Given the exclusion of Dr. Sperry's testimony, and pursuant to the discussion above, Plaintiffs cannot show that Wilson's death was caused by any action—or inaction—by Defendants. Accordingly, summary judgment is warranted on Plaintiffs' state negligence claim asserted on their own behalf to recover for Wilson's wrongful death, and we affirm the district court's order granting summary judgment as to the wrongful death claim on causation grounds.

As discussed above, Defendants have not shown that they are entitled to summary judgment as to their claim for Wilson's

pre-death pain and suffering on causation grounds.  But it is clear that Defendants' treatment of Wilson—which is the basis for the pain and suffering claim—does not qualify as a "ministerial act" for which liability can arise under Georgia law if performed negligently.  *See Grammens v. Dollar*, 287 Ga. 618, 619 (Ga. 2010) (discussing the difference between ministerial and discretionary acts for purposes of official immunity).  As the Georgia Supreme Court explained in *Grammens*:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty.  A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

*Id.  See also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1309 (11th Cir. 2009) (citing Georgia law for the rule that "[a] ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty" (quotation marks omitted)).  Applying this definition, Defendants' decisions as to the appropriate care of Wilson under the circumstances were discretionary rather than ministerial acts.  *See Harry v. Glynn County*, 269 Ga. 503, 505 (Ga. 1998) (holding that a paramedic's response to an emergency aid call, unsuccessful treatment of a patient there, and transport of the

patient to the hospital "were clearly discretionary"); *Polk County v. Ellington*, 306 Ga. App. 193, 201 (Ga. App. 2010) ("[R]esponding to an emergency is not a relatively simple, specific duty. Rather, it is a discretionary task, requiring the exercise of personal judgment to determine how best to proceed." (internal citation and quotations marks omitted and alterations adopted)); *Schulze v. DeKalb County*, 230 Ga. App. 305, 308 (Ga. App. 1998) (granting official immunity to paramedics, and explaining that they "exercised personal deliberation and judgment in delaying transportation of [the patient] to the hospital for several minutes").

It is undisputed that Defendants conducted a medical assessment of Wilson when they were called to the scene of his arrest. Specifically, they felt Wilson's skin, visually assessed his breathing by watching his chest movements, and used a ZOLL monitor to determine his pulse and oxygen levels. Based on their assessment, Defendants determined that no further assessment or treatment of Wilson was necessary. As discussed above, a jury might reasonably infer that this determination was so reckless that it amounted to a deliberate indifference to Wilson's obvious medical needs, particularly given the additional information Defendants received at the end of their assessment that Wilson was foaming at the mouth. But it cannot be disputed that the determination of "what medical treatment to provide" Wilson under the circumstances required the exercise of clinical judgment on the part of Defendants and was thus "an act of discretion subject to official immunity" under Georgia law. *Graham v. Cobb County*, 316 Ga. App. 738, 742–43 (Ga.

App. 2012). *See also Barnett v. Caldwell*, 302 Ga. 845, 848 (Ga. 2018) (noting that an act is ministerial only when "directives are so clear, definite, and certain as to merely require the execution of a specific, simple, absolute, and definite duty, task, or action in a specified situation without any exercise of discretion"). Accordingly, Defendants are entitled to official immunity as to Plaintiffs' state negligence claim asserted on behalf of Wilson's estate to recover for his pre-death pain and suffering.

In short, Plaintiffs cannot prevail on their state negligence claim seeking recovery for damages arising from Wilson's death because, given Dr. Sperry's exclusion, there is no evidence that Defendants' conduct caused Wilson's death.[7] As to the state negligence claim asserted on behalf of Wilson's estate to recover for his pre-death pain and suffering, that claim is precluded by official immunity under Georgia law. For these reasons, we affirm the district court's order granting summary judgment on Plaintiffs' state negligence claims.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment on Plaintiffs' § 1983 wrongful death and state negligence claims. We **REVERSE** the district court's order granting summary judgment on Plaintiff's § 1983

---

[7] Of course, even if Defendants' conduct had caused Wilson's death, the wrongful death claim would have been precluded by the Georgia official immunity doctrine, just as the pre-death claim is precluded.

claim asserted on behalf of Wilson's estate to recover for any part of his pre-death pain and suffering that can be attributed to Defendants' deliberate indifference.  As to that claim, we **REMAND** this case to the district court for further proceedings consistent with this opinion.